DAWE v DR REUVEN BAR-LEVAV & ASSOCIATES, PC
(ON REMAND)

Docket No. 269147. Submitted May 11, 2010, at Lansing. Decided August
12, 2010, at 9:00 a.m.

Elizabeth Dawe brought an action in the Oakland Circuit Court
against Dr. Reuven Bar-Levav & Associates, P.C., the estate of
Reuven Bar-Levav, M.D., and Leora Bar-Levav, M.D., after
Joseph Brooks, defendants' former psychiatric patient, shot
plaintiff and others during a group-therapy session. Dawe
alleged that defendants committed common-law medical mal-
practice by negligently placing Brooks in her therapy group
when they knew or should have known that he was not a
suitable candidate for group therapy. Dawe also alleged that
defendants were liable under MCL 330.1946 because they had
failed to warn her that Brooks had made threatening state-
ments to defendants. Defendants moved for summary disposi-
tion, which the court, Charles W. Simon, J., denied. The court
also denied defendants' later motion for a partial directed
verdict. The jury returned a verdict in Dawe's favor. The court
subsequently denied defendants' motions for judgment notwith-
standing the verdict and for a new trial. Defendants appealed,
and Dawe cross-appealed. The Court of Appeals, WHITBECK, C.J.,
and K. F. KELLY, J. (SMOLENSKI, P.J., dissenting), reversed with
regard to the trial court's denial of the motion for a directed
verdict, vacated the judgment, and remanded the case for entry
of an order dismissing Dawe's claims. The Court of Appeals
reasoned that MCL 330.1946 limited a mental-health profes-
sional's duty to warn and protect third parties and, therefore,
abrogated common-law claims for failure to warn or protect.
The Court of Appeals further held that Dawe had failed as a
matter of law to establish her claim that defendants violated
MCL 330.1946. 279 Mich App 552 (2008). Dawe sought leave to
appeal, and defendants sought leave to cross-appeal. The Su-
preme Court granted Dawe's application and reversed, holding
that MCL 330.1946 did not abrogate a plaintiff-patient's
common-law medical malpractice claim when the mental-health
professional's separate duty arising out of his or her special
relationship with the patient would apply and no threat as

described in the statute had been communicated to the mental-health professional. In lieu of granting defendants' application for leave to cross-appeal, the Supreme Court remanded the case to the Court of Appeals for consideration of the remaining issues raised on appeal in that court. 485 Mich 20 (2010).

On remand, the Court of Appeals *held*:

1. Defendants had a psychiatrist-patient relationship with Dawe that imposed on them duties to protect her from harm by a third party and to treat her within the standard of care applicable to medical professionals. Because Dawe was among the class of persons who could foreseeably be harmed by defendants' decision to place Brooks in group therapy, defendants owed Dawe a duty to take reasonable precautions to ensure that patients assigned to the group were suitable for group therapy. A reasonable jury could have concluded that defendants proximately caused Dawe's injury by placing Brooks in the therapy group in breach of the applicable standard of care. The trial court did not err by denying defendants' motion for judgment notwithstanding the verdict.

2. The trial court did not err by allowing Dawe to present evidence that permitted an inference that defendants failed to properly treat Brooks because the evidence was relevant to Dawe's theory of the case.

3. The trial court's erroneous instructions to the jury, which intertwined Dawe's statutory and common-law claims, did not unfairly prejudice defendants in light of the strong evidence supporting Dawe's common-law claim, which made it unlikely that the jury relied on a purported violation of MCL 330.1946 to conclude that defendants breached the standard of care owed to Dawe.

4. The verdict against Leora Bar-Levav was not against the great weight of the evidence. There was evidence from which a reasonable jury could have concluded that she participated to some extent in placing Brooks in group therapy and breached the standard of care by failing to perform additional assessments of Brooks and his suitability for group therapy.

5. MCL 600.1483 caps the amount of noneconomic damages a plaintiff may receive, but the cap is adjusted annually for inflation. The trial court correctly applied the noneconomic damages cap in effect on the date that the judgment for Dawe was entered rather than the cap in effect when she filed suit.

6. The trial court did not abuse its discretion by refusing to admit into evidence a manuscript written by Brooks given that the manuscript arrived at defendants' office several months after

defendants' treatment of Brooks had ended. Because there was no evidence that the manuscript was written while Brooks was in defendants' care, it was not relevant to defendants' decision to place Brooks in group therapy. Moreover, the limited references to the manuscript that Dawe's counsel made during the trial were minimally prejudicial and could not have had a controlling influence on the verdict.

7. The trial court erred when it concluded that Dawe was only entitled to interest on a portion of the past noneconomic damages found by the jury. The jury awarded Dawe past noneconomic damages and future noneconomic damages in excess of the applicable cap under MCL 600.1483. MCL 600.6013(1) excludes prejudgment interest on future noneconomic damages. The trial court determined that Dawe was entitled to prejudgment interest on the portion of her capped damages equal to the ratio of past noneconomic damages to future noneconomic damages found by the jury. MCL 600.1483(1), however, must be construed as requiring the reduction of future noneconomic damages before past noneconomic damages. When a jury finds that a plaintiff has past noneconomic damages in excess of the applicable cap, the plaintiff is entitled to prejudgment interest on the full amount of the capped award under MCL 600.6013(1).

Award of prejudgment interest vacated and remanded for recalculation of interest; affirmed in all other respects.

1. NEGLIGENCE — MENTAL-HEALTH PROFESSIONALS — PATIENTS — COMMON-LAW DUTIES TO PATIENTS — DUTY TO WARN OR PROTECT PATIENTS.

A psychiatrist-patient relationship is a special relationship that imposes a duty on the psychiatrist to protect the patient from harm by a third party and to treat the patient within the standard of care applicable to medical professionals; when the patient is among the class of persons who could foreseeably be harmed by the psychiatrist's decision to place a third party in group therapy, the psychiatrist owes the patient a duty to take reasonable precautions to ensure that the third party is suitable for group therapy.

2. DAMAGES — INTEREST — MEDICAL MALPRACTICE — PAST NONECONOMIC DAMAGES — FUTURE NONECONOMIC DAMAGES — CAP ON NONECONOMIC DAMAGES.

A plaintiff is entitled to prejudgment interest on an award for past noneconomic damages, not on an award for future noneconomic damages; when the jury finds that the plaintiff has past noneconomic damages in excess of the applicable cap on noneconomic damages in a medical malpractice action, the plaintiff

is entitled to prejudgment interest on the full amount of the capped award, regardless of whether the jury also awarded the plaintiff future noneconomic damages; if the past noneconomic damages do not exceed the cap, the plaintiff is entitled to interest on the actual amount of past noneconomic damages awarded (MCL 600.1483, MCL 600.6013).

*Mark Granzotto, P.C.* (by *Mark Granzotto*), and *Haas & Goldstein, P.C.* (by *Justin Haas*), for plaintiff.

*Collins, Einhorn, Farrell & Ulanoff, P.C.* (by *Noreen L. Slank*), for defendants.

ON REMAND

Before: WHITBECK, P.J., and FITZGERALD and K. F. KELLY, JJ.

PER CURIAM. This medical malpractice action returns to this Court on remand from the Michigan Supreme Court[1] with the direction that we evaluate the remaining issues raised in defendants' original appeal and plaintiff's cross-appeal.[2] In the original appeal, defendants, Dr. Reuven Bar-Levav & Associates, the estate of Dr. Reuven Bar-Levav, and Dr. Leora Bar-Levav, appealed as of right the jury verdict in favor of plaintiff, Elizabeth Dawe, on various grounds. On cross-appeal, Dawe appealed the trial court's calculation of prejudgment interest on the jury's award and the trial court's refusal to permit the admission of certain evidence. We vacate the award of prejudgment interest and remand for recalculation of the interest consistently with this opinion. In all other respects, we affirm.

---

[1] *Dawe v Dr Reuven Bar-Levav & Assoc, PC,* 485 Mich 20; 780 NW2d 272 (2010).

[2] This case was originally submitted to Judges SMOLENSKI, WHITBECK, and K. F. KELLY. Judge FITZGERALD has been substituted as a panel member for these proceedings on remand.

I. BASIC FACTS

The basic facts were set out in our previous opinion[3] as follows:

> This medical malpractice action arises out of a shooting incident at defendants' psychiatric office where Dawe received treatment. On June 11, 1999, Joseph Brooks, who was a former patient of Dr. [Reuven] Bar-Levav,[1] came to the office, drew a handgun, and shot and killed Dr. Bar-Levav. Brooks then proceeded to the back of the office and fired into Dawe's group therapy room. Brooks killed one patient and wounded others, including Dawe. After firing dozens of rounds into the room, Brooks committed suicide.
>
> Dawe sued defendants, alleging that Brooks made threatening statements to defendants in which he indicated that he "fantasized about murdering" and that he demonstrated his ability to carry out threats by coming to defendants' office with a handgun. Dawe further alleged that a "manuscript" that Brooks delivered to defendants in June 1999 "could be reasonably construed as a threat of violence against other members who participated in his group therapy sessions, including [Dawe]." Accordingly, Dawe alleged that defendants were liable under two theories: statutory liability for failure to warn under MCL 330.1946, and common-law medical malpractice. With respect to her common-law medical malpractice claim, Dawe alleged that defendants breached their applicable standard of care, which included "informing the police, warning patients or others, and taking reasonable precautions for the protection of patients when a doctor or health care provider has information which could reasonably be construed as a threat of violence against a patient or others," when defendants failed to warn Dawe and the police of Brooks's "threats" or take reasonable steps to protect Dawe. Dawe also filed an affidavit of Meritorious Claim in support of her complaint.[2]

---

[3] *Dawe v Dr Reuvan Bar-Levav & Assoc, PC*, 279 Mich App 552, 554-557; 761 NW2d 318 (2008), rev'd 485 Mich 20 (2010). We note that Dr. Reuven Bar-Levav's first name was misspelled in the previous opinion.

Defendants moved for summary disposition under MCR 2.116(C)(8) and (C)(10), arguing that there was no evidence that Brooks expressed a threat to defendants about Dawe specifically and, therefore, defendants owed no duty to warn or protect Dawe under MCL 330.1946. Defendants also noted that Dawe was not alleging malpractice with regard to her individual care; rather, her only allegation was a failure to fulfill the duty to warn, which was derived solely from the statute.

In response, Dawe argued that it was significant that she was defendants' patient rather than merely a "third person" to whom the statute applied. Dawe argued that her special physician-patient relationship with defendants also required them to treat her within the applicable standard of care stated in her complaint. In other words, Dawe argued that defendants owed both statutory and common-law duties. Dawe further argued that she had presented a genuine issue of material fact that defendants violated that standard of care. In support of her motion, Dawe submitted the affidavit of Dr. Mark Fettman, Dawe's psychiatric expert, who attested that a psychiatrist has a duty to take reasonable precautions for the protection of patients. According to Dr. Fettman, included within this duty is the requirement that the psychiatrist assess a patient to determine if the patient is a suitable candidate for group therapy before placing the patient in a group. Dr. Fettman averred that once a patient has been placed in group therapy, the psychiatrist has a further duty to continually assess the patient to ensure that the patient remains suitable for group therapy. Dr. Fettman attested that defendants violated the applicable standard of care by placing Brooks in a group session with Dawe and other patients.

The trial court ruled that summary disposition was not appropriate because Dawe had stated a prima facie case and there were genuine issues of material fact regarding whether defendants violated MCL 330.1946 or the applicable standard of care. Accordingly, the trial court denied defendants' motion.

At trial, Dawe argued that defendants breached their duty to warn and that defendants breached their duty to provide

Dawe with a safe clinical environment for her treatment. Specifically, Dawe contended that defendants breached the standard of care by placing Brooks in Dawe's group therapy sessions when they knew or should have known that Brooks was a danger to the other group members.

After the close of Dawe's proofs, defendants moved for a partial directed verdict on Dawe's claim of failure to warn under MCL 330.1946, arguing that Dawe failed to establish that Brooks communicated to defendants a threat of violence specifically against Dawe. Defendants also argued that Dawe failed to present expert testimony concerning the standard of care applicable under the statute; that is, defendants noted that Dr. Fettman's testimony applied solely to defendants' alleged duties when placing Dawe in group therapy, not to defendants' duty to warn. In response, Dawe again argued that it was significant that she was defendants' patient, apparently on the basis that MCL 330.1946 did not even apply in cases where the victim was a patient.[3] Nevertheless, the trial court denied the motion on the ground that Dawe had stated a prima facie case sufficient to survive a directed verdict.

After the six-day trial in September 2005, the jury returned a verdict in favor of Dawe. Defendants moved for a judgment notwithstanding the verdict (JNOV) and for a new trial, raising several of the same issues now raised on appeal; however, the trial court denied the motions. Defendants now appeal.

---

[1] Defendants discharged Brooks from their care on March 19, 1999.

[2] See MCL 600.2912d.

[3] Dawe's counsel specifically stated: "[T]his statute that [defendants are] referring to is talking—it's in establishing a duty by someone that isn't normally a patient. That doesn't exist here because Elizabeth Dawe was [a patient]. . . . This other statute is talking about if Elizabeth Dawe wasn't a patient[.]"

In their appeal, defendants argued: (1) that because the record was devoid of evidence that Brooks communicated to defendants a specific threat of physical violence against Dawe, defendants had no duty to protect Dawe from Brooks and Dawe's claim under MCL 330.1946 failed as a matter of law, (2) that MCL 330.1946 preempted the common law and provided the only basis for finding that defendants had a duty to warn or protect Dawe, (3) that even if a common-law duty survived the enactment of MCL 330.1946, defendants had no duty in this case because Brooks's actions were unforeseeable, (4) that admission of irrelevant testimony regarding Brooks's own treatment confused the jury and prejudiced defendants, (5) that the trial court's erroneous intertwining of Dawe's statutory and common-law claims contaminated the verdict, (6) that Dawe's lack of expert testimony required dismissal of her statutory claim, (7) that the verdict against Dr. Leora Bar-Levav was against the great weight of the evidence, (8) that the mention of a manuscript written by Brooks compromised the fairness of the trial, and (9) that the trial court applied the incorrect noneconomic damages cap. Dawe cross-appealed, arguing (1) that the trial court erred when calculating prejudgment interest and (2) that the trial court abused its discretion by refusing to admit Brooks's manuscript into evidence.

A majority of this Court (WHITBECK, C.J., and K. F. KELLY, J.) held that MCL 330.1946 abrogated a mental-health professional's common-law duty to warn or protect third parties from dangerous patients. According to the majority, the statute also abrogated the common-law duty to treat other patients within the standard of care to the extent that that standard of care required a mental-health professional to provide a safe clinical environment for treatment. The majority held that the term "third person," as used in MCL 330.1946,

refers to any person who is not the dangerous patient or the mental-health professional, including the mental-health professional's other patients.[4] In sum, the majority concluded that the trial court erred by failing to grant defendants a directed verdict because Dawe had failed to present evidence from which a reasonable fact-finder could have concluded that Brooks communicated a threat of physical violence against Dawe to defendants.[5] The majority reversed the trial court's denial of defendants' motion for a directed verdict, vacated the judgment against defendants, and remanded the matter for entry of an order dismissing Dawe's claims. The majority did not address defendants' remaining issues or those issues raised by Dawe on cross-appeal.[6]

In dissent, Judge SMOLENSKI concluded that MCL 330.1946 applies to patients who are "recipients," as that term is defined in MCL 330.1100c(12),[7] and because Brooks was not a recipient, MCL 330.1946(1) did not abrogate or modify defendants' common-law duty to protect a third party from Brooks. Thus, Judge SMOLENSKI concluded that the statute did not abrogate or modify Dawe's common-law claim against defendants.[8]

Dawe sought leave to appeal in the Michigan Supreme Court, and defendants sought leave to cross-appeal. The Supreme Court reversed this Court's decision, holding as follows:

---

[4] *Id.* at 564-568.

[5] *Id.* at 570-571.

[6] *Id.* at 571.

[7] A "recipient" is "an individual who receives mental health services from the [Department of Community Health], a community mental health services program, or a facility or from a provider that is under contract with the department or a community mental health services program." MCL 330.1100c(12).

[8] *Dawe*, 279 Mich App at 575-576 (SMOLENSKI, P.J., dissenting).

Although the Legislature partially abrogated a mental health professional's common-law duties, the language of the statute expressly limits its own scope. The final sentence of MCL 330.1946(1) states that "[e]xcept as provided in this section, a mental health professional does not have a duty to warn a third person of a threat *as described in this subsection* or to protect the third person." (Emphasis added.) The type of threat described in subsection (1) is "a threat of physical violence against a reasonably identifiable third person . . . ." MCL 330.1946(1). Further, the patient making the threat must have "the apparent intent and ability to carry out that threat in the foreseeable future" before a mental health professional's duty under MCL 330.1946(1) is triggered. Therefore, MCL 330.1946(1) only modified a mental health professional's common-law duty to warn or protect a *third person* when a "threat as described in [MCL 330.1946(1)]" was communicated to the mental health professional because the statute only places a duty on mental health professionals to warn third persons of or protect them from the danger presented by a threat "as described" in MCL 330.1946(1). This statutory duty only arises if three criteria are met: (1) a patient makes a threat of physical violence, (2) the threat is against a reasonably identifiable third person, and (3) the patient has the apparent intent and ability to carry out the threat. If these three criteria are not met, the mental health professional's duty under the statute is not triggered. Thus, on its face, the statute does not completely abrogate a mental health professional's separate common-law special relationship duty to protect his or her patients by exercising reasonable care.[9]

In lieu of granting defendants' application for leave to cross-appeal, however, the Supreme Court remanded the matter to this Court for consideration of the remaining issues raised on appeal.[10] The Supreme Court directed this Court's "attention to the jury instructions,

---

[9] *Dawe*, 485 Mich at 29-30.

[10] *Id.* at 33-34.

which may not have properly distinguished between the statutory and common-law claims in this case."[11]

## II. COMMON-LAW DUTY

### A. STANDARD OF REVIEW

Defendants note that Dawe's medical malpractice claim was based on an alleged duty to protect her from Brooks by not placing them in group therapy together. Defendants argue that they did not have a common-law duty to protect Dawe from Brooks's criminal acts because (1) defendants' relationship with Brooks ended three months before the shooting and (2) their psychiatrist-patient relationship with Dawe did not give rise to a duty to protect her from the unforeseen acts of third parties. Defendants also argue that they cannot be liable for Brooks's criminal acts because his criminal acts were not the proximate cause of any breach of duty on their part. Whether a defendant owes a duty to a plaintiff is a question of law, which this Court reviews de novo.[12]

### B. DEFENDANTS' PROFESSIONAL DUTY TO DAWE

It is undisputed that defendants had an established psychiatrist-patient relationship with Dawe, and a psychiatrist-patient relationship is a "special" relationship that imposes a duty to protect another from harm by a third party.[13] In light of this relationship, defendants owed a duty to treat Dawe within the standard of

---

[11] *Id.* at 34 n 8.

[12] *Fultz v Union-Commerce Assoc*, 470 Mich 460, 463; 683 NW2d 587 (2004).

[13] *Dawe*, 485 Mich at 22, 26-27; *Murdock v Higgins*, 454 Mich 46, 54; 559 NW2d 639 (1997); *Graves v Warner Bros*, 253 Mich App 486, 493-494; 656 NW2d 195 (2002).

care applicable to medical professionals[14] and to protect her from harm by a third party. In *Williams v Cunningham Drug Stores, Inc*,[15] the Michigan Supreme Court explained the rationale for the exception to the general rule that there is no duty to aid or protect someone from harm by a third party:

> Social policy, however, has led the courts to recognize an exception to this general rule where a special relationship exists between a plaintiff and a defendant. Thus, a common carrier may be obligated to protect its passengers, an innkeeper his guests, and an employer his employees. The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety.

At some point in the course of Dawe's treatment, defendants decided to treat Dawe with group therapy and to include Brooks in Dawe's therapy group. The decision to pursue a particular course of treatment involves considerations of professional medical judgment that implicate the duty to provide proper medical care to a patient.[16] Moreover, while participating as a patient in group therapy, Dawe entrusted her well-being to defendants. Defendants alone controlled the clinical environment; defendants determined when and where the group would meet and determined which patients, doctors, and therapists would participate in the group. Dawe had neither the training nor access to the relevant background information to evaluate

---

[14] See *Dyer v Trachtman*, 470 Mich 45, 49-50, 54; 679 NW2d 311 (2004).

[15] *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 499; 418 NW2d 381 (1988).

[16] See *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 46-47; 594 NW2d 455 (1999).

whether a particular patient posed a danger to her. Instead, Dawe had to trust that defendants were acting in her best interests and would use their training and experience to ensure that each patient in the group was suitable for group therapy. This is precisely the kind of special relationship that gives rise to a duty to protect the victim from harms inflicted by third parties.[17] Likewise, it is foreseeable that a patient who is not healthy enough to participate in group therapy may be or may become a danger to the other members of the group. Therefore, because Dawe was among the class of persons who could foreseeably be harmed by defendants' decision to place Brooks into group therapy, defendants owed Dawe a duty to take reasonable precautions to ensure that the patients assigned to the group were sufficiently healthy to participate in group therapy.[18]

Although it is for a court to decide the existence of a duty,

> the jury decides whether there is cause in fact and the specific standard of care: whether defendants' conduct in the particular case is below the general standard of care, including . . . whether in the particular case the risk of harm created by the defendants' conduct is or is not reasonable.[19]

---

[17] See *Williams*, 429 Mich at 498-499.

[18] *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977) (noting that a duty will not be imposed unless "it is foreseeable that the actor's conduct may create a risk of harm to the victim"); *Graves*, 253 Mich App at 494-495 (noting that the duty of reasonable care extends to those parties who are readily identifiable as being foreseeably endangered); see also *Bryson v Banner Health Sys*, 89 P3d 800, 805 (Alas, 2004) (holding that a treatment center, which placed a female client into a substance abuse treatment group with another patient with known propensities to commit violent sexual assaults, had a duty to protect its female client "from danger in the course of her treatment—including foreseeable danger from her fellow patients").

[19] *Moning*, 400 Mich at 438.

Accordingly, it was for the jury to decide whether defendants' decision to place Brooks into group therapy with Dawe fell below the general standard of care applicable to medical professionals and whether that decision was the cause of Dawe's injuries.

### C. FORESEEABILITY AS AN ELEMENT OF PROXIMATE CAUSE

Defendants also argue that Dawe failed to prove proximate cause as a matter of law. Specifically, defendants contend that criminal acts are not foreseeable and that Brooks's criminal acts in particular were too remote in time from defendants' alleged breach to constitute a proximate cause of Dawe's injuries.

In a medical malpractice action, the plaintiff must prove that the defendant's breach of the applicable standard of care proximately caused the plaintiff's injuries.[20] Proximate cause is usually a factual issue to be decided by the trier of fact, but if the facts bearing on proximate cause are not disputed and if reasonable minds could not differ, the issue is one of law for the court.[21] "[L]egal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences."[22] In order for negligence to be the proximate cause of an injury, " 'the injury must be the natural and probable consequence of a negligent act or omission, which under the circumstances, an ordinary prudent person ought reasonably to have foreseen might probably

---

[20] *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).

[21] *Jones v Detroit Med Ctr*, 288 Mich App 466; 794 NW2d 55 (2010).

[22] *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994) (citation omitted).

occur as a result of his negligent act.' "[23] "There may be more than one proximate cause of an injury."[24]

Courts in Michigan have long recognized that criminal acts by third parties can be foreseeable.[25] Further, although the length of time between the shooting and Brooks's departure from defendants' care is relevant to whether defendants' placement of Brooks into Dawe's group constituted a proximate cause of Dawe's injuries, it is not dispositive.[26] As Judge SMOLENSKI concluded in his dissent from the original opinion, Dawe

> presented evidence that defendants knew or should have known that Brooks would form improper emotional attachments to persons in his group therapy and that he might seek out those persons long after the termination of his participation in the group. Given this evidence, a reasonable jury could conclude that defendants' breach of the

[23] *Paparelli v Gen Motors Corp*, 23 Mich App 575, 577; 179 NW2d 263 (1970), quoting *Nielsen v Henry H Stevens, Inc*, 368 Mich 216, 220; 118 NW2d 397 (1962).

[24] *Allen v Owens-Corning Fiberglas Corp*, 225 Mich App 397, 401; 571 NW2d 530 (1997).

[25] See *Samson v Saginaw Prof Bldg, Inc*, 393 Mich 393, 406-409, 409; 224 NW2d 843 (1975) (stating that whether the criminal acts of a patient-visitor to the landlord's premises were foreseeable was properly a jury question); *Hersh v Kentfield Builders, Inc*, 385 Mich 410, 415; 189 NW2d 286 (1971) (stating that whether the defendant employer knew or should have known of its employee's dangerous propensities, and therefore should be held liable for the employee's criminal assault, was a question for the jury); *Davis v Thornton*, 384 Mich 138, 149; 180 NW2d 11 (1970) (stating that reasonable persons might conclude that the defendant's act of leaving his keys in an unlocked car, which was later stolen and involved in an accident, was "not too remote a cause of the plaintiff's injuries and that the joyrider's intervention did not sever that causal connection"); *Ross v Glaser*, 220 Mich App 183; 559 NW2d 331 (1996) (holding that a father may be held civilly liable for a murder committed by his son, who had a history of mental illness, when the father provided a loaded gun to his son while the son was in an agitated state).

[26] See *Mich Sugar Co v Employers Mut Liability Ins Co of Wisconsin*, 107 Mich App 9, 15; 308 NW2d 684 (1981) ("Lapse of time does not foreclose the cause of an injury from being its proximate cause.").

standard of care foreseeably included the possibility that Brooks would return long after the conclusion of his participation in group therapy and harm persons with whom he formed these attachments. Therefore, the lapse of time alone was insufficient to render Brooks's actions unforeseeable as a matter of law.[27]

A reasonable jury could have concluded that defendants proximately caused Dawe's injury by placing Brooks in the therapy group in breach of the applicable standard of care; therefore, the trial court did not err by refusing to grant defendants' motion for JNOV on this basis.[28]

### III. DUTY OF CARE OWED TO BROOKS

Defendants argue that the trial court erred when it permitted Dawe to elicit testimony concerning the duty of care they owed to Brooks. Defendants point out that Dawe's medical malpractice claim was based on allegations that *she* received substandard treatment by virtue of Brooks's inclusion in her group-therapy session. Therefore, according to defendants, evidence regarding their alleged improper treatment of Brooks likely confused the jury and prejudiced defendants and they are entitled to a new trial. We disagree.

Although Dawe initially argued that defendants had a common-law duty to warn or protect her in light of defendants' relationship with Brooks, by the time of the trial Dawe limited her claims to a statutory violation of the duty imposed by MCL 330.1946 and a breach of the duty arising out of defendants' psychiatrist-patient relationship with Dawe. As Judge SMOLENSKI concluded in his dissent from the original opinion, Dawe

did not present evidence or argue that defendants failed to properly treat Brooks. [Dawe] presented evidence that

---

[27] *Dawe*, 279 Mich App at 589 (SMOLENSKI, P.J., dissenting).

[28] See *Nichols v Dolber*, 253 Mich App 530, 532; 655 NW2d 787 (2002).

Brooks had symptoms and exhibited behavior that indicated that Brooks was not suitable for group therapy. [Dawe] further presented evidence that Brooks was placed in group therapy without first requiring him to go through a lengthy period of individual treatment and taking proper medication. Although this evidence permits an inference that defendants failed to properly treat Brooks, the evidence was relevant to [Dawe's] theory of the case. MRE 401; MRE 402.[29]

Therefore, there was no error warranting a new trial.

### IV. JURY INSTRUCTIONS

#### A. STANDARD OF REVIEW

Defendants note that this Court has held that Dawe's statutory claim failed as a matter of law[30] and argue that the trial court erroneously intertwined the statutory and common-law claims when instructing the jury. Therefore, defendants contend that a new trial is required because an erroneous theory of liability was submitted to the jury and the general verdict made it impossible to know how the error affected the verdict. On appeal, this Court reviews de novo claims of instructional error.[31] Reversal is not required unless the failure to reverse would be inconsistent with substantial justice.[32]

#### B. ANALYSIS

Dawe originally sued under two separate theories of liability: statutory liability for failure to warn under

---

[29] *Dawe*, 279 Mich App at 590 (SMOLENSKI, P.J., dissenting).

[30] *Id. at* 569-570 (WHITBECK, C.J.).

[31] *Cox v Flint Bd of Hosp Managers,* 467 Mich 1, 8; 651 NW2d 356 (2002); *Rose v State Farm Mut Auto Ins Co,* 274 Mich App 291, 294; 732 NW2d 160 (2007).

[32] MCR 2.613(A); *Ward v Consolidated Rail Corp,* 472 Mich 77, 84, 87; 693 NW2d 366 (2005).

MCL 330.1946 and common-law medical malpractice for failure to warn. But although Dawe presented MCL 330.1946 as a separate theory supporting liability, the trial court did not instruct the jury that a breach of the duty imposed by MCL 330.1946 could alone support a verdict against defendants. Instead, the trial court instructed the jury, "If you find that any of the Defendants violated this statute before or at the time of the occurrence, *such violation is evidence of negligence* which you should consider, together with all of the evidence, in deciding whether the Defendant was negligent."[33] Further, the trial court instructed the jury that "professional negligence or malpractice" means

> the failure to do something which a psychiatrist of ordinary learning, judgment or skill in this community or a similar one would do, or the doing of something which is—a psychiatrist of ordinary learning, judgment or skill would not do under the same or similar circumstances you find to exist in this case.

The only theory of liability before the jury was medical malpractice. And the relevant inquiry, therefore, is whether the trial court's instruction caused such prejudice that it would be "inconsistent with substantial justice" to refuse to grant defendants a new trial.[34]

As Judge SMOLENSKI set forth in his dissent from the original opinion,

> [i]n his video trial deposition, Dr. Mark Fettman, who [was Dawe's] psychiatric expert, testified that a psychiatrist has a duty to take reasonable precautions for the protection of patients. Included within this duty is the requirement that the psychiatrist assess a patient to determine if the patient is a suitable candidate for group therapy before placing him

---

[33] Emphasis added.

[34] MCR 2.613(A); *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

or her into a group. Once a patient has been placed in group therapy, the psychiatrist has a further duty to continually assess the patient to ensure that the patient remains suitable for group therapy. Consistent with this testimony, [Dawe's] proofs largely consisted of evidence concerning what defendants knew or should have known about Brooks's mental health and how defendants used that information.

Testimony and records submitted to the jury established that Brooks was institutionalized after he attempted suicide in 1992. Dr. Joseph Gluski testified that Brooks was referred to his practice after Brooks left the group home. Gluski stated that he treated Brooks from April 1994 to October 1995. Gluski testified that Brooks was on antipsychotic medications when he arrived at the practice and that he determined that Brooks should remain on antipsychotic medications during treatment. Gluski acknowledged that he wrote in Brooks's chart that Brooks had mentally slipped back into 1992, which was the year he tried to commit suicide, around the time that he ceased taking his medications. Gluski also testified that Brooks appeared to misunderstand how he was being treated in group therapy and thought that the others were conspiring against him. Gluski stated that Brooks abruptly stopped treatment in October 1995.

Gluski also described two incidents with Brooks returning to his office after treatment was over. Gluski testified that in the summer of 1996, Brooks called and asked to have a meeting with Gluski and Anika Kirby, the therapist who led Brooks's group therapy sessions. At the meeting, Brooks asked questions about Kirby's ethnic background, which was Finnish. Brooks had even brought a map of Finland with him.

Gluski also testified about an incident that occurred in the summer of 1997 or 1998. Gluski testified that Brooks barged into his office before normal office hours and began searching the office for Kirby. Gluski stated that Brooks seemed agitated and thought he might get physical. Gluski testified that Brooks seemed furious and made comments about his treatment in group therapy. Gluski left the office

and walked to a nearby restaurant, but Brooks followed him and did not leave until Gluski called the police. Gluski acknowledged that the police report indicated that Gluski told the officer that Brooks had said, "You better run." The report also indicated that Brooks told him, "I want to get your partner."

Gluski testified that, after Brooks began treating with defendants, [Dr. Reuven Bar-Levav] called about Brooks. Gluski said he told [Bar-Levav] about the incidents with Brooks and warned him that Brooks was dangerous. Gluski said he also told [Bar-Levav] that, if [Bar-Levav] decided to treat Brooks, Brooks should be in individual treatment for one full year and needed to be on medication. Gluski stated that he was so concerned that he called [Bar-Levav] the next day to reiterate that [Bar-Levav] should be careful.

In addition to Gluski's testimony, [Dawe] presented evidence that, on October 19, 1998, Brooks came to defendants' office and told Joseph Froslie, who was a therapist at the practice, that he had obtained a gun and driven to New Hampshire with an intent to kill his ex-girlfriend's mother and then commit suicide. In response to this revelation, Froslie asked Brooks to bring the gun in to the office, which Brooks did. After Brooks brought the gun to the office, Froslie contacted Dr. Leora Bar-Levav . . . , who was [Dr. Reuven Bar-Levav's] daughter and also a psychiatrist at [Dr. Reuven Bar-Levav's] practice. [Dr. Leora Bar-Levav] performed a general mental-status examination of Brooks. Although [she] prescribed a two-week supply of medication after this incident and claimed to have performed further assessments of Brooks, the jury heard evidence that these subsequent assessments were not documented and that no one at defendants' practice recalled ever having a specific discussion about Brooks. Hence, the jury could have concluded that no other steps were taken to ensure that Brooks was not a danger to himself or others. Notwithstanding these prior incidents, in December 1998, [Dr. Reuven Bar-Levav] decided to place Brooks in group therapy. Testimony established that [Bar-Levav] made the decision after consulting with the other staff members.

> Froslie testified that Brooks exhibited some narcissistic behavior and also had disturbances in social functioning. James Stanislaw, another group therapist at the practice, testified that Brooks had some symptoms that were consistent with paranoid schizophrenia, including confused thinking and suspiciousness, and that he was not always appropriate or responsive in group therapy. Froslie also indicated that Brooks sometimes did not appear to understand the group therapy process. Brooks was finally discharged from the practice in March 1999 after [Dr. Reuven Bar-Levav] prescribed medication to Brooks, which Brooks refused to take.[35]

The evidence provided compelling proof that defendants knew or should have known that Brooks posed a danger to the other patients in his therapy group and that, therefore, defendants should not have placed Brooks in the group. In contrast, the evidence tending to support Dawe's claim under MCL 330.1946 was quite limited. It is unlikely that the jury relied on a purported violation of MCL 330.1946 to conclude that defendants breached the standard of care. Consequently, the erroneous instruction did not unfairly prejudice defendants, and a new trial is not warranted on that basis.[36]

### V. VERDICT AGAINST DR. LEORA BAR-LEVAV

#### A. STANDARD OF REVIEW

Defendants argue that the evidence at trial indicated that Dr. Leora Bar-Levav had limited interaction with Brooks and did not participate in the decision to place Brooks into group therapy. Even Dawe's expert recognized that Dr. Reuven Bar-Levav alone made the decision to place Brooks into group therapy. Therefore, defendants argue that the verdict against Dr. Leora Bar-Levav was against the great weight of the evidence and that this

---

[35] *Dawe*, 279 Mich App at 580-583 (SMOLENSKI, P.J., dissenting).

[36] *Case*, 463 Mich at 6.

Court should grant a new trial for each defendant or, at least, JNOV for Dr. Leora Bar-Levav.

This Court may overturn a jury verdict that is against the great weight of the evidence.[37] But a jury's verdict should not be set aside if there is competent evidence to support it.[38] Determining whether a verdict is against the great weight of the evidence requires review of the whole body of proofs.[39] The issue usually involves matters of credibility or circumstantial evidence,[40] but if there is conflicting evidence, the question of credibility ordinarily should be left for the factfinder.[41] Similarly, the weight to be given to expert testimony is for the jury to decide.[42]

### B. ANALYSIS

As Judge SMOLENSKI set forth in his dissent from the original opinion,

> [a]t trial, Fettman testified that the applicable standard of care required defendants to take steps to ensure that the clinical environment was safe for [Dawe's] treatment. Fettman stated that this required defendants to assess Brooks's suitability for group therapy before placing him in a therapy group and to continuously assess him thereafter to determine whether he remained suitable for group therapy. Fettman testified that defendants breached the standard of care by placing Brooks into a therapy group when there were clear

---

[37] MCR 2.611(A)(1)(e); *Wischmeyer v Schanz*, 449 Mich 469, 485; 536 NW2d 760 (1995).

[38] *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 498; 668 NW2d 402 (2003).

[39] *People v Herbert*, 444 Mich 466, 475; 511 NW2d 654 (1993), overruled in part on other grounds by *People v Lemmon*, 456 Mich 625, 627; 576 NW2d 129 (1998).

[40] *In re Robinson*, 180 Mich App 454, 463; 447 NW2d 765 (1989).

[41] *Shuler v Mich Physicians Mut Liability Co*, 260 Mich App 492, 519; 679 NW2d 106 (2004).

[42] *Guerrero v Smith*, 280 Mich App 647, 669; 761 NW2d 723 (2008).

signs that he was not suitable for group therapy and by failing to continually assess and communicate about Brooks's continued suitability for group therapy.

Although Fettman indicated that he understood the evidence to show that [Dr. Reuven Bar-Levav] had the final decision regarding the placement of Brooks in group therapy, there was testimony that this decision was made after receiving input from all the staff members. The jury also heard evidence that [Dr. Leora Bar-Levav] performed the assessment of Brooks after he disclosed that he had traveled to New Hampshire to kill his ex-girlfriend's mother. There was also evidence that suggested that [Dr. Leora Bar-Levav] failed to make any subsequent assessments. Finally, evidence indicated that [she] participated in several of Brooks's group therapy sessions and yet failed to make any of the continuing assessments that Fettman testified would be required with a patient like Brooks.[43]

From this evidence, a reasonable jury could have concluded that Dr. Leora Bar-Levav did participate to some extent in Brooks's placement in group therapy. A reasonable jury could also have concluded that Dr. Leora Bar-Levav breached the standard of care by failing to perform additional assessments of Brooks and by failing to continuously reevaluate whether Brooks should be in group therapy. Finally, a reasonable jury could have concluded that these breaches of the standard of care proximately caused Dawe's injuries. Therefore, there was competent evidence to support the jury verdict against Dr. Leora Bar-Levav.

### VI. ADJUSTED DAMAGES CAP

#### A. STANDARD OF REVIEW

Under MCL 600.1483, Dawe's noneconomic damages are capped. However, the cap is adjusted annually for

---

[43] *Dawe*, 279 Mich App at 590-591 (SMOLENSKI, P.J., dissenting).

inflation, and defendants argue that the trial court erred by applying the adjusted cap that was applicable on the date of the verdict rather than the adjusted cap that was applicable on the date Dawe commenced her suit. The amount of the cap applicable to an award of noneconomic damages is a matter of statutory interpretation that this Court reviews de novo.[44]

### B. ANALYSIS

As Judge SMOLENSKI set forth in his dissent from the original opinion,

> MCL 600.1483(1) limits the total amount of noneconomic damages that may be recovered by all plaintiffs as a result of negligence arising out of an action alleging medical malpractice. The cap was initially set at $280,000 for injuries, such as those at issue in this case, that do not meet the exceptions stated under MCL 600.1483(1)(a) to (c). However, under MCL 600.1483(4), the state treasurer is required to adjust this amount annually to reflect changes in the consumer price index. Although the statute provides for the annual adjustment of the cap, it does not address how this adjustment affects suits that are pending but have not yet been reduced to judgment.
>
> In examining the applicability of the damages cap to wrongful death actions arising from medical malpractice, [the Michigan] Supreme Court noted that "[o]nly after the court or jury has, in its discretion, awarded damages as it considers fair and equitable does the court, pursuant to [MCL 600.6304(5)], apply the noneconomic damages cap of [MCL 600.1483]." *Jenkins v Patel*, 471 Mich 158, 172; 684 NW2d 346 (2004), citing MCL 600.6098(1) and MCL 600.6304(5). The Court further noted that the damages cap does not impinge on the jury's right to determine the amount of damages, but rather only limits the legal conse-

---

[44] *Shinholster v Annapolis Hosp*, 471 Mich 540, 548; 685 NW2d 275 (2004).

quences of the jury's finding by limiting the amount of the judgment on the verdict. *Id.* at 173.[45]

Therefore, the cap only applies to a judgment rendered after a verdict.[46] The amount of the cap is the amount in effect on the date the judgment is entered.[47] Accordingly, the trial court did not err by applying the 2005 cap.

VII. THE MANUSCRIPT

A. BACKGROUND

As Judge SMOLENSKI set forth in his dissent from the original opinion,[48]

> [b]efore trial, defendants moved in limine to preclude [Dawe] from eliciting testimony about or referring to a document that the parties referred to as the "manuscript." The manuscript contained Brooks's ramblings about [Dr. Reuven Bar-Levav's] therapy techniques and Brooks's belief that his therapists "used" him to benefit the other members of the therapy group. In the manuscript, Brooks wrote about his desire to seek revenge, but did not directly threaten any one person or group. Brooks mailed the manuscript to [Dr. Reuven Bar-Levav] one day before the shooting. In their motion, defendants argued that evidence and arguments concerning the manuscript should be precluded because the manuscript was not relevant. Specifically, defendants noted that the manuscript arrived after Brooks's placement in group therapy and contained no threat within the meaning of MCL 330.1946. Defendants

---

[45] *Dawe*, 279 Mich App at 596 (SMOLENSKI, P.J., dissenting).

[46] *Shivers v Schmiege*, 285 Mich App 636, 650; 776 NW2d 669 (2009); *Velez v Tuma*, 283 Mich App 396, 417; 770 NW2d 89 (2009).

[47] *Shivers*, 285 Mich App at 650; *Velez*, 283 Mich App at 417; see also *Wessels v Garden Way, Inc*, 263 Mich App 642, 652-654; 689 NW2d 526 (2004) (holding that the cap applicable to product liability actions is determined by the date of the judgment).

[48] *Dawe*, 279 Mich App at 592-594 (SMOLENSKI, P.J., dissenting).

also contended that there was no evidence that [Bar-Levav] read it. For these reasons, defendants argued, it could not be used to support any of [Dawe's] claims and should not be referred to or admitted into evidence. The trial court denied defendants' motion in limine.

At trial, defendants again moved to have the manuscript excluded. The trial court agreed that the manuscript was not relevant and also concluded that it was more inflammatory than probative. Therefore, the trial court excluded the manuscript. In addition, the trial court specifically precluded Dawe's counsel from asking any questions about the manuscript.

Although the trial court excluded the manuscript, [Dawe's] counsel had already commented on the manuscript during his opening statement. Specifically, [Dawe's] counsel stated that Brooks sent

"a manuscript, priority mail, addressed to Dr. Bar-Levav. It was received the next day. Maria Attard will tell you she handed the package to Dr. Bar-Levav. She's unsure if she opened it or he opened it, but she is certain of one thing, nobody reads his mail but him.

"At a later point in the day, Dr. Bar-Levav gave the manuscript back to Maria and said he's [sic] read it over the weekend. The defendants will tell you that Dr. Bar-Levav didn't have any idea what was inside the package. However, before the shooting took place, Mr. Baker will tell you that he recalls hearing that a manuscript had been received and he was advised that it was a confused document based on something Brooks had read in Dr. Bar-Levav's book.

"This is not something he was advised of in a formal meeting, Mr. Baker will tell you, but there was a buzz around the office, people were talking about the manuscript. What was in this manuscript, all the experts agree, is a very troubled, very confused writing that demonstrated a psychotic episode. The manuscript talks about revenge. The manuscript talks about Brooks feeling that he was being used in therapy."

[Dawe's] counsel also stated that defendants "failed to warn [plaintiff] that Brooks had made threats against her group after receiving the manuscript . . . ."[4]

After the trial court's ruling to preclude testimony concerning the manuscript, there were two brief references to the manuscript. First, a witness who testified by deposition referred to the timing of the arrival of the package. Second, [Dawe's] counsel referred to the fact that the manuscript had not been submitted to the jury. He stated:

"[B]ut you may have a question in your mind, where['s] the manuscript, and you have heard reference throughout the trial, but it hasn't come into evidence.

"Those are the decisions, as the Judge instructed you at the beginning, he's going to tell you at the end, were made outside of your presence, and that's without respect to whether or not an attorney or myself wanted to actually present this certain evidence. For legal reasons, sometimes it doesn't come into evidence. You can't hold that against us. And at the time when we thought it was coming in, we told you you were going to see it, but that changed. But as the Judge will tell you, if he makes certain decisions on things, its not to be held against the attorneys."

---

[4] [Dawe's] counsel also noted that if the jury found that there was "no duty to warn about the manuscript," but nevertheless concluded that defendants had a "duty to keep the clinic safe, then you must enter a decision of negligence."

---

### B. DAWE'S CROSS-APPEAL

On cross-appeal, Dawe argues that the trial court erred when it refused to permit admission of Brooks's manuscript because it was relevant. We review for an abuse of discretion a trial court's decision to admit or exclude evidence.[49]

---

[49] *Barrett v Kirtland Community College*, 245 Mich App 306, 325; 628 NW2d 63 (2001).

Generally, all relevant evidence is admissible at trial. Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.[50] "Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point."[51]

It is undisputed that the manuscript at issue arrived long after the termination of Brooks's relationship with defendants' practice. Therefore, the manuscript could not serve as evidence that defendants breached the applicable standard of care by placing Brooks into Dawe's therapy group or permitting him to remain in the group. That is, because there was no evidence that the manuscript was written while Brooks was under defendants' care, it may not have reflected Brooks's mental health at the time he was being treated. Hence, it was not relevant to defendants' decision to place Brooks in group therapy. Therefore, the trial court did not abuse its discretion by concluding that the manuscript was not relevant.

### C. DEFENDANTS' APPEAL

Although the trial court excluded the manuscript from evidence, defendants argue that they were prejudiced by the references to Brooks's manuscript that Dawe's counsel made at trial. As Judge SMOLENSKI recognized in his dissent from the original opinion,

> defendants did not object to [Dawe's] opening or closing remarks. Further, when redacting the deposition testimony of the witness at issue, defendants' counsel specifically

---

[50] MRE 401; *People v Crawford*, 458 Mich 376, 388-389; 582 NW2d 785 (1998).

[51] *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001).

asked to have certain references to the manuscript removed, which the trial court granted. . . .

\* \* \*

[T]aken as a whole, [Dawe's] attorney's remarks were minimally prejudicial and could not have had a controlling influence on the verdict. *Wiley*, [*v Henry Ford Cottage Hosp*, 257 Mich App 488, 505; 668 NW2d 402 (2003)]. Furthermore, the trial court instructed the jury that the attorneys' comments were not evidence. This instruction cured any minimal prejudice that these comments may have had. *Tobin* [*v Providence Hosp*, 244 Mich App 626, 641; 624 NW2d 548 (2001)]. There was no error warranting the requested relief.[52]

### VIII. PREJUDGMENT INTEREST

#### A. STANDARD OF REVIEW

On cross-appeal, Dawe argues that the purpose of awarding a plaintiff prejudgment interest is to compensate the plaintiff for the loss of the use of funds. Therefore, she contends, when, as in this case, the jury awards the plaintiff past noneconomic damages that exceed the applicable statutory cap, the plaintiff is entitled to prejudgment interest on the entire capped amount. This Court reviews de novo questions of statutory interpretation such as the proper application of MCL 600.6013 and MCL 600.1483.[53]

#### B. ANALYSIS

As Judge SMOLENSKI set forth in his dissent from the original opinion,[54]

---

[52] *Dawe*, 279 Mich App at 594-595 (SMOLENSKI, P.J., dissenting).

[53] *Shinholster*, 471 Mich at 548.

[54] *Dawe*, 279 Mich App at 597-602 (SMOLENSKI, P.J., dissenting).

[w]hen rendering its verdict, the jury had to make specific findings of fact regarding the amount of past economic damages, past noneconomic damages, future economic damages, and future noneconomic damages for [Dawe]. MCL 600.6305(1). Future damages are defined to be "damages arising from personal injury which the trier of fact finds will accrue after the damage findings are made . . . ." MCL 600.6301(a). Noneconomic damages are defined as "damages or loss due to pain, suffering, inconvenience, physical impairment, physical disfigurement, or other noneconomic loss." MCL 600.1483(3). In the present case, the jury found that [Dawe] suffered a total of $600,000 in past medical expenses[5] and $400,000 in past noneconomic damages. The jury also found that [Dawe] would suffer $1,040,000 in future noneconomic damages. The verdict form did not provide for future economic damages.

Once the jury awarded damages, [Dawe] was entitled to interest on her money judgment. MCL 600.6013(1). Although MCL 600.6013(8) provides that interest "is calculated on the entire amount of the money judgment, including attorney fees and other costs" from the filing of the complaint, MCL 600.6013(1) specifically excludes interest "on future damages from the date of filing the complaint to the date of entry of the judgment." Hence, under a plain reading of MCL 600.6013, [Dawe] would normally be entitled to interest on the full amount of her past noneconomic damages. However, in a medical malpractice action, the trial court is required to reduce an award of damages to "the amount of the appropriate limitation set forth in [MCL 600.1483]." MCL 600.6304(5). Under MCL 600.1483(1), the total noneconomic damages recoverable by [Dawe] could not exceed $371,800. Because the jury found that [Dawe] suffered more than $1.4 million in total noneconomic damages, the trial court had to reduce the total award for noneconomic damages to $371,800. By its plain terms, MCL 600.1483(1) applies to "the total amount of damages for noneconomic loss recoverable by all plaintiffs . . . ." However, the Legislature failed to address how MCL 600.1483(1) should be applied to separate awards of past and future noneconomic damages. This legislative

silence poses no problem in cases where the jury finds either past or future noneconomic damages but not both, or where the combined total of past and future noneconomic damages does not exceed the applicable cap.[6] However, where the jury finds both past and future noneconomic damages whose combined total exceeds the cap provided by MCL 600.1483, it becomes essential to a proper determination of prejudgment interest under MCL 600.6013(1) to first determine how the cap applies to the individual awards of past and future noneconomic damages.

Because MCL 600.1483 and MCL 600.6013 both relate to the trial court's entry of a judgment after a jury renders a verdict, they must be read together as though constituting one law. *State Treasurer v Schuster*, 456 Mich 408, 417; 572 NW2d 628 (1998). Nevertheless, it is clear that the statutes serve distinct purposes. The Legislature enacted MCL 600.1483 to control increases in health care costs by limiting the liability of medical care providers. *Zdrojewski v Murphy*, 254 Mich App 50, 80; 657 NW2d 721 (2002). This purpose is accomplished by *limiting* the amount of compensation that a plaintiff may obtain for noneconomic damages. In contrast, MCL 600.6013 serves two purposes: (1) to compensate the prevailing party for the loss of the use of funds awarded as a money judgment and for the costs of bringing a court action and (2) to provide an incentive for prompt settlement. *Old Orchard by the Bay Assoc v Hamilton Mut Ins Co*, 434 Mich 244, 252-253; 454 NW2d 73 (1990), overruled on other grounds by *Holloway Constr Co v Oakland Co Bd of Co Rd Comm'rs*, 450 Mich 608, 615-616 (1996). With regard to the latter purpose, [the Michigan] Supreme Court explained that the "award of statutory prejudgment interest . . . serves a distinct deterrent function by both encouraging settlement at an earlier time and discouraging a defendant from delaying litigation solely to make payment at a later time." *Old Orchard*, [434 Mich] at 253. These purposes are accomplished under MCL 600.6013 by *increasing* the costs that a defendant will have to pay if the plaintiff prevails. Although these statutes appear to conflict, they can be construed together in a way that substantially preserves the purpose of each.

It must be noted that MCL 600.1483 does not limit all forms of compensation that a defendant may be required to pay after a verdict in favor of the plaintiff. The statute does not limit economic damages and does not purport to limit interest, attorney fees, or other costs. In contrast, MCL 600.6013 clearly requires compensation in the form of interest on the entire amount of the money judgment, which excludes future damages, but includes attorney fees and other costs. See MCL 600.6013(8). Thus, MCL 600.6013 has broader application than MCL 600.1483. Further, application of the cap provided by MCL 600.1483 directly and substantially affects the compensatory and deterrent effects of MCL 600.6013, while application of MCL 600.6013, which is based on the total damages, attorney fees, and costs, only indirectly affects the purpose of MCL 600.1483. Therefore, absent any guidance from the statutory language, I conclude that MCL 600.1483 should be construed in a way that minimizes its overall effect on a plaintiff's ability to receive the compensation required by MCL 600.6013. See *Denham v Bedford*, 407 Mich 517, 528-529; 287 NW2d 168 (1980) (examining a prior version of MCL 600.6013 and noting that the prejudgment interest statute is remedial and entitled to liberal interpretation).

In the present case, the trial court determined that [Dawe] would not be entitled to prejudgment interest on the full amount of the capped noneconomic damages award. Instead, the trial court determined that [Dawe] would be entitled to interest on that portion of the capped damages equal to the ratio of past noneconomic damages to future noneconomic damages found by the jury. Applying this formula to the $371,800 noneconomic damages cap, the trial court concluded that $140,949.38 of the capped amount represented past noneconomic damages and $230,850.62 represented future noneconomic damages.

Although this solution appears equitable on its face, it is clear from its application that it significantly undermines the remedial purposes of MCL 600.6013. Future damages include damages for harm that a plaintiff will suffer during his or her remaining life. See *Rickwalt v Richfield Lakes Corp*, 246 Mich App 450, 469; 633 NW2d 418 (2001); MCL

600.6305(2). Further, future damages are reduced to a present cash value and payable with the judgment. MCL 600.6306(1). Hence, a plaintiff will invariably receive timely compensation for his or her future losses. In contrast, past damages reflect losses that the plaintiff has already incurred and for which he or she has not yet received any compensation. Yet, under the trial court's method, [Dawe] would receive less compensation for the injuries she has already suffered solely on the basis that she would at some point in the future suffer further losses. Indeed, on this basis, the trial court more than halved the amount of interest to which [Dawe] was entitled under MCL 600.6013(1) for her past damages. This method of applying MCL 600.1483 defeats the purpose of MCL 600.6013 without substantially furthering the purposes of the damages cap.

This problem can be avoided only by construing MCL 600.1483 in such a way as to minimize its effect on the application of MCL 600.6013. Hence, I construe MCL 600.1483(1) to reduce future noneconomic damages before past noneconomic damages. Where the jury finds that the plaintiff has past noneconomic damages in excess of the applicable cap, as is the case here, the plaintiff will be entitled to prejudgment interest on the full amount of the applicable cap under MCL 600.6013(1). However, where the past noneconomic damages do not rise to the level of the applicable cap, the plaintiff will only be entitled to interest on the actual amount of the past noneconomic damages found by the jury. In this way, the plaintiff will be fully compensated for the losses already suffered.

---

[5] This amount was reduced by the trial to $44,338.28, which was the amount of medical expenses for which [Dawe] presented evidence at trial.

[6] In cases where the jury finds only past noneconomic damages, the plaintiff would clearly be entitled to prejudgment interest on the full amount. MCL 600.6013(1). Likewise, in cases where the jury finds only future noneconomic damages, the plaintiff would clearly not be entitled to any prejudgment interest on that amount. *Id.* Finally, where a

jury finds both past and future noneconomic damages, but the combined total does not exceed the cap provided by MCL 600.1483, the trial court would not reduce the either the past or future economic damages and the plaintiff would be entitled to prejudgment interest on the full amount of the past noneconomic damages.

In light of the foregoing, we conclude that the trial court erred when it concluded that Dawe was only entitled to interest on a portion of the past noneconomic damages found by the jury. Therefore, we vacate the award of interest and remand this case to the trial court for recalculation of the interest.

IX. EXPERT TESTIMONY REGARDING DUTY UNDER MCL 330.1946

Because the Supreme Court did not disrupt our decision that Dawe failed to present sufficient evidence to establish a breach of duty imposed under MCL 330.1946,[55] we need not address defendants' argument that Dawe had the burden of presenting expert testimony regarding that duty.

We vacate the award of prejudgment interest and remand for recalculation of the interest consistent with this opinion. In all other respects, we affirm. We do not retain jurisdiction.

---

[55] *Id.* at 569-570 (WHITBECK, C.J.).