# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL J. BIBER,

   Plaintiff-Appellant/Cross-Appellee,

and

BIBER, O'TOOLE, FOWLER, & CLARKSON, PLC,

   Plaintiff,

v

WAYNE W. WEBBER,

   Defendant-Appellee/Cross-Appellant,

and

JOAN AND WAYNE WEBBER, LLC

   Defendant-Appellee.

UNPUBLISHED
May 2, 2017

No. 329455
Livingston Circuit Court
LC No. 2014-028264-CZ

Before: O'BRIEN, P.J., and SERVITTO and STEPHENS, JJ.

PER CURIAM.

  Plaintiff-Appellant/Cross-Appellee, Michael J. Biber, appeals as of right the trial court's July 14, 2015 order of judgment, which reflected the jury's finding that, while Defendant-Appellee/Cross-Appellant, Wayne W. Webber, breached a contract to pay Biber a fee or bonus, he was not entitled to any damages. Biber also challenges the trial court's September 10, 2015 order, which denied his motions for a new trial and to set aside the July 14, 2015 order of judgment. Webber cross-appeals as of right the July 14, 2015 order, challenging the trial court's May 1, 2015 order, which allowed a check to be admitted into evidence and precluded Webber from referring to Michigan Rules of Professional Conduct 1.5(c) and 1.8(a) during trial. For the reasons set forth below, we affirm the trial court's July 14, 2015 order.

-1-

This lawsuit arises out of a contract dispute between Webber, a businessman, and Biber, a lawyer. Webber and Biber have known each other for several decades, have been business partners, and have, from time to time, been in an attorney-client relationship. In 1997, Webber sought Biber's services in an effort to sell multiple Texas-based concrete-paving businesses ("Webber Texas Companies"), in which Webber was an 85-percent majority shareholder. At that time, Webber and Biber allegedly agreed to a three-percent commission-based fee if and when Biber was able to successfully sell Webber Texas Companies. While a sale never materialized at that time, Biber and Webber continued their relationship and, eventually, sought to sell Webber Texas Companies again in 2004. According to Biber, Webber apparently insisted that he "go hard [and] move forward" with the sale efforts at a meeting in November 2004. Biber testified at trial that he agreed to do so at a two-percent commission-based fee. According to Biber, he and Webber reduced this agreement to a handwritten contract on a legal pad that Webber kept, but neither party was able to produce the writing at trial. In fact, Webber denied that such a writing existed.

After allegedly reaching this agreement, Biber testified, he spent several thousand hours pursuing a buyer for Webber Texas Companies. Eventually, Ferrovial, a Spanish company, agreed to purchase Webber Texas Companies for $220,000,000, and a stock-purchase agreement was executed on August 8, 2005. Under the terms of the stock-purchase agreement, a portion of the sale price, $23,500,000, was held in escrow to be distributed after Webber Texas Companies satisfied certain conditions. In any event, closing was scheduled for and occurred on September 15, 2005, and Biber, Webber, and Charlie Burnett, the 15-percent minority shareholder of Webber Texas Companies, apparently celebrated the sale at a dinner that evening. Biber testified that at that dinner, Webber and Burnett orally agreed to a one-percent commission-based fee or bonus for his efforts in consummating the sale of Webber Texas Companies. Consequently, Biber claims, Burnett agreed to pay him $200,000, and Webber agreed to pay him $2,000,000. However, according to Biber, he and Webber agreed that his one-percent fee or bonus would be deferred until the escrowed funds were distributed.

After the closing, Ferrovial raised concerns regarding whether Webber Texas Companies actually satisfied the conditions under the stock-purchase agreement referred to above, such as, whether Ferrovial received the assets promised. These concerns eventually led to four years of arbitration proceedings that Biber facilitated. Webber testified that, despite Biber's assurances that he would receive the entire $23,500,000 that was held in escrow, he only ended up receiving $13,500,000 when the arbitration proceedings eventually ended. The remaining $10,000,000 was purportedly distributed as follows: $5,000,000 to Ferrovial, $2,000,000 in tax liabilities, and $3,000,000 in attorney fees that were paid to Biber, O'Toole, Fowler & Clarkson, PLC ("BOFC"), the firm in which Biber was a senior partner, and other law firms. Webber testified that he was very unhappy with this outcome.

According to Biber, Burnett eventually paid his portion of the one-percent fee or bonus agreed to at the September 15, 2005 dinner. Webber, however, never paid the remaining $2,000,000 that was allegedly agreed to. Therefore, Biber filed this lawsuit, alleging, in relevant part, that Webber breached that agreement. During trial, Biber referred to several purported fee agreements with respect to the sale of the Webber Texas Companies, but, as far as we can tell, he is now only claiming entitlement to $2,000,000 as a result of the alleged breach by Webber of the September 15, 2005 agreement. To support that claim, Biber

offered, and the trial court admitted into evidence, a check from Burnett to Biber in the amount of $300,000. According to Biber, this check reflected the $200,000 that he was to be paid under the oral agreement at the celebratory dinner as well as an additional, but unrelated, $100,000 that he was owed. Webber expressly denied the existence of any such agreement. Rather, it was Webber's position that Biber was adequately compensated for his services through payments that were made to BOFC. To support his position, Webber offered evidence regarding compensation that was paid to BOFC, including more than $1,000,000 between 1999 and 2009 in relation to the sale of Webber Texas Companies, at all pertinent times. He also offered the testimony of Richard Gibbs, the chief financial officer of Webber Texas Companies, who denied any knowledge of the claimed $2,000,000 oral agreement.

After a seven-day jury trial, the jury returned a verdict, and the trial court entered an order of judgment reflecting that verdict shortly thereafter. While the jury found that Webber had, in fact, breached an agreement with Biber, it awarded Biber "$0" in damages. Biber filed several post-trial motions, arguing that such a verdict was inconsistent as a matter of law. After reviewing the parties' briefs and hearing their arguments, the trial court ultimately denied Biber's motions, reasoning that "the jury can find a breach of contract and they can find that no money was owed for whatever reason they want in their sound judgment." This appeal and cross-appeal followed.

On appeal, Biber first argues that the jury, by finding that a contract existed between Webber and Biber but awarding no damages, reached an inconsistent verdict. Because the trial court had a duty to remedy that inconsistency but failed to do so, Biber claims, a new trial is required. We disagree.

"[I]t is fundamental that every attempt must be made to harmonize a jury's verdict. Only where verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside." *Granger v Fruehauf Corp*, 429 Mich 1, 9; 412 NW2d 199 (1987). When "there is an interpretation of the evidence that provides a logical explanation for the findings of the jury, the verdict is not inconsistent." *Local Emergency Fin Assistance Loan Bd v Blackwell*, 299 Mich App 727, 738-739; 832 NW2d 401 (2013) (citations and internal quotation marks omitted). "There is no legal requirement that a jury award damages simply because liability was found. Indeed, before damages can be awarded, they must be proved." *Joerger v Gordon Food Serv, Inc*, 224 Mich App 167, 173; 568 NW2d 365 (1997).

Applying those rules to the facts of this case, it is our view that there is an interpretation of the evidence that provides a logical explanation for the finding of the jury. Consequently, we conclude that the jury's verdict was not inconsistent. The jury instructions and verdict form allowed the jury to come to the conclusion that it did; that is, the jury instructions and verdict form expressly allowed the jury to find the existence of a contract to pay Biber a fee or bonus for selling Webber Texas Companies that was breached by Webber but nevertheless conclude that Biber was unable to successfully prove he was damaged as a result. The jury verdict form that asked whether "Michael Biber prove[d] that there was a breach of contract between Wayne Webber and Michael Biber to pay a fee or performance bonus that Wayne Webber Breached[,]" and the jury answered that question in the affirmative. However, the jury answered the question at issue in this appeal—"What is the

amount of damages that Michael Biber Proved he is entitled to receive for Wayne Webber's breach of contract?"—as follows: "$0." This jury finding was consistent with the trial court's jury instruction, which Biber did not object to and does not challenge on appeal, that if the jury finds "that defendant is liable to plaintiff for breach of contract, then you must determine the amount of money, *if any*, to award to plaintiff as contract damages." (Emphasis added.) Biber did not object with the judge's use of the words "if any" in the instruction to the jury, and it was the open-ended nature of the verdict form's question that left open the possibility of a verdict where the damages proved were deemed to be zero.

Indeed, the evidence presented below could logically explain the outcome that Biber proved that Webber breached a contract but did not adequately prove his damages. See *Local Emergency Fin Assistance Loan Bd*, 299 Mich App at 739 (providing that a jury verdict is not inconsistent so long as there is an interpretation of the evidence that provides a logical explanation for the jury's findings). Here, the trial court correctly instructed the jury that Biber was required to "prove his damages to a reasonable certainty or a reasonable probability" and that "you may not award damages on the basis of guess, speculation, or conjecture." See *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003) ("The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach."). In viewing the lower-court record as a whole, it is plausible that the jury could have found that Biber failed to prove his requested amount of damages to a "reasonable certainty." As discussed below, the only evidence to support this amount was Biber's own testimony and a somewhat unrelated check that he described as being part of the alleged agreement for his fee or bonus. The trial court correctly recognized the jury's ability to discredit this testimony during the hearing on Biber's post-trial motion. The trial court also correctly noted that any flaws in the verdict form were agreed to by counsel:

> They had that form. That form, the jury form was argued over to every comma and every word that went to, that went to that jury. That was definitely not a standard jury form. That was a well-crafted jury form and the parties all signed off on it. I don't think there was an objection.

Had Biber challenged the verdict form with respect to the possible damages—for example, he could have argued that the verdict form should allow only a decision as to whether the $2,000,000 contract, and not any other contract, was breached—our conclusion may well have been different, but, perhaps for strategic reasons, he did not.

On appeal, Biber relies on *Farm Bureau Mut Ins Co v Sears, Roebuck & Co*, 99 Mich App 763; 298 NW2d 634 (1980), a nonbinding tort case, to support his position. In that case, the insured's house and personal property were destroyed by a fire allegedly caused by the defendant's negligent repair of a furnace. *Id*. at 764-765. The property was insured in part by plaintiff, the insurer, which, as subrogee, initiated an action against defendant to recover the $26,850 that it paid out to insured for the fire loss. *Id*. The insured filed an intervening complaint against the defendant to recover damages incurred in excess of the amount of insurance coverage. *Id*. at 765. The jury returned a verdict in favor of the insured in the amount of $15,500 but awarded no compensation to the insurer despite the fact that the insurer's claim was based *entirely* on the success of the insured's claim. *Id*. Recognizing

that the insurer's claim was derivative of the insured's claim, this Court ultimately concluded that awarding the insured, but not the insurer, damages was inconsistent as a matter of law and ordered a new trial. *Id*. at 768-769. Unlike *Farm Bureau*, however, this case involves one claim, a breach-of- contract claim, against one defendant. There is no derivative liability at issue here. This distinction is critical because the derivative nature of the claims in *Farm Bureau* controlled the outcome. Here, however, there is only one claim, and finding a breach of contract but no damages represents two different conclusions with respect to two different elements—not two different conclusions with respect to an identical, albeit derivative, claim. Therefore, the jury was free to find that Biber was not entitled to any damages even if the jury did find a breach of contract.

On appeal, Biber also argues that the trial court erroneously denied his motion for judgment notwithstanding the verdict. Relatedly, Biber also argues that the trial court erroneously denied his motion for a new trial. Both of these arguments are premised on his position that the jury's damages verdict was against the great weight of the evidence. Ultimately, Biber argues that the evidence presented at trial clearly established that he was entitled to $2,000,000 in damages as a result of a breached business contract. We disagree.

A party's motion for judgment notwithstanding the verdict (JNOV) "should be granted only when there was insufficient evidence presented to create an issue of fact for the jury." *Heaton v Benton Constr Co*, 286 Mich App 528, 532; 780 NW2d 618 (2009). "When deciding a motion for JNOV, the trial court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party and determine whether the facts presented preclude judgment for the nonmoving party as a matter of law." *Merkur Steel Supply, Inc v Detroit,* 261 Mich App 116, 123-124; 680 NW2d 485 (2004). If the evidence is such that reasonable people could disagree, the question is for the jury, and judgment notwithstanding the verdict is therefore improper. *Foreman v Foreman*, 266 Mich App 132, 136; 701 NW2d 167 (2005).

A motion for a new trial may be granted, on some or all of the issues, if a verdict is against the great weight of the evidence. MCR 2.611(A)(1)(e). "Determining whether a verdict is against the great weight of the evidence requires review of the whole body of proofs." *Dawe v Dr Reuvan Bar-Levav & Assoc, PC (On Remand)*, 289 Mich App 380, 401; 808 NW2d 240 (2010). "The trial court cannot substitute its judgment for that of the factfinder, and the jury's verdict should not be set aside if there is competent evidence to support it." *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 194; 600 NW2d 129 (1999). If there is conflicting evidence, the resolution of these conflicts should be left for the factfinder. *Rossien v Berry*, 305 Mich 693, 701; 9 NW2d 895 (1943). Stated differently, "[t]his Court will give substantial deference to a trial court's determination that the verdict is not against the great weight of the evidence." *Ellsworth*, 236 Mich App at 194.

On appeal, Biber claims that the evidence at trial concerning damages overwhelmingly supported his contention that the fee or bonus payable by Webber was $2,000,000. However, in analyzing all of the proofs offered at trial, it is evident that the jury could have disbelieved the evidence offered by Biber to support his claim for $2,000,000. Contrary to Biber's arguments on appeal, Gibbs and Webber never admitted that there was ever a $2,000,000 fee or bonus that Webber owed. In fact, Webber vigorously denied any such agreement. Webber was asked several different times throughout the trial as to whether he ever

discussed such a fee or bonus with Biber, and each time he denied ever doing so. Gibbs similarly testified that he did not remember whether Biber ever mentioned the alleged $2,000,000 agreement and that he did not "recall . . . how [Biber] got that number." With the exception of a $300,000 check from Burnett and Biber's own testimony, there is no other evidence present in the record to support Biber's claim that he was entitled to $2,000,000, and the jury was free to credit or discredit that evidence. *Taylor v Mobley,* 279 Mich App 309, 314; 760 NW2d 234 (2008).

Furthermore, the jury could have found that Biber was already paid any money that he was entitled to for his efforts in the sale of Webber Texas Companies. Gibbs testified that Webber paid BOFC, a firm that Biber was still involved with, millions of dollars in legal fees in connection with the sale of Webber Texas Companies. There was also other evidence admitted at trial that the jury could have relied on to discredit the $2,000,000 amount. For example, the jury could have found that Biber's claim for $2,000,000 in damages was incredible in light of the testimony of Michael Collins, the investment banker hired by Webber in November 2004 to help find a buyer. Collins testified that he worked for Webber until the September 2005 closing of Webber Texas Companies and spent between 1,500 and 2,000 hours on that engagement. Unlike Biber, Collins had a written agreement with Webber that included a retainer upfront and a commission-based fee if and when the sale occurred. On the basis of Collins' testimony, the jury could have concluded that Collins, not Biber, performed a majority the services in facilitating the sale of Webber Texas Companies. Additionally, Gibbs testified that Webber told him that he was "thinking about paying Mr. Biber a sum of money" and that his exact words were "when this is all done, if I'm happy [with the results of sale of Webber Texas Companies], Mr. Biber will be happy." The jury could have found that, despite the existence of this agreement, any award by the jury in this regard would have required that it speculate or guess a specific amount, and the trial court correctly instructed the jury that it was not to do so. While Biber's testimony might have allowed a conclusion that the specific amount was $2,000,000, it was the jury's, not the trial court's or this Court's, role as a factfinder to determine whether the proofs admitted at trial did or did not adequately prove that amount. The jury did precisely that.

Accordingly, we affirm the trial court's July 14, 2015 order reflecting the jury's verdict. In light of this conclusion, we decline to address the arguments raised on cross-appeal.

Affirmed. Webber, as the prevailing party, may tax costs pursuant to MCR 7.219.


/s/ Colleen A. O'Brien
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens