*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BARBARA KINDIG,

        Plaintiff-Appellant/Cross-Appellee,

v

HARRY N. HERKOWITZ, M.D., ESTATE OF
HARRY N. HERKOWITZ, by LYNDA A.
GLASSER, Personal Representative, and
ORTHOPAEDIC INSTITUTE, PC,

        Defendants-Appellees/Cross-
        Appellants.

UNPUBLISHED
February 27, 2020

No. 340262
Oakland Circuit Court
LC No. 2015-149918-NH

Before: CAMERON, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

Plaintiff Barbara Kindig appeals by right a judgment of no cause of action that was entered by the trial court on the basis of the jury's verdict in this medical malpractice action. The jury, while finding defendant Dr. Harry Herkowitz professionally negligent, also found that plaintiff failed to prove that she suffered an injury. Plaintiff argues that the trial court erred by denying her motion for judgment notwithstanding the verdict (JNOV). In the alternative, plaintiff contends that the trial court abused its discretion by denying her motion for new trial, arguing that the jury's verdict was against the great weight of the evidence. Defendants cross appeal, arguing that the trial court erred by denying their motion for directed verdict. Defendants argue that plaintiff failed to prove, as a matter of law, that the standard of care was breached. We affirm.

## I. FACTUAL BACKGROUND

On May 2, 2013, Dr. Herkowitz performed a bilateral decompressive lumbar laminectomy and spinal fusion on plaintiff.[1] During surgery, Dr. Herkowitz encountered a 1-1/2 centimeter tear

---

[1] Dr. Herkowitz died in June 2013, just weeks after performing plaintiff's initial surgery.

in plaintiff's dura; he repaired the tear by using a lock-stitch suture method and placing each suture between 1 and 2 millimeters apart.[2] About one month after the surgery, plaintiff complained of headaches and severe back pain. Defendants' expert witness, Dr. Richard Easton, ordered a CT myelogram, which revealed a "cerebral spinal fluid leak." The CT myelogram also revealed a "mass . . . inside the dura." Dr. Easton performed a second surgery on plaintiff, during which he repaired the dural tear and removed surgical foam that was found inside of plaintiff's dura. Three subsequent surgeries followed to address recurring spinal fluid leaks caused by dural tears that had to be repaired. The last surgery was performed on August 1, 2013. In July 2014, Dr. Easton diagnosed plaintiff with arachnoiditis.[3] Thereafter, plaintiff filed this medical malpractice action.

Plaintiff's theory at trial, as supported by her expert, Dr. Kalman Blumberg, was that Dr. Herkowitz committed medical malpractice by suturing closed plaintiff's dura with the surgical foam inadvertently left inside her dura. According to plaintiff and Dr. Blumberg, Dr. Herkowitz's negligence required the second surgery to remove the surgical foam. Plaintiff argued that this second surgery, more likely than not, caused the arachnoiditis and caused a significant increase in the risk of recurrent dural tears, which, in fact, occurred and necessitated the subsequent surgeries. To support her argument that Dr. Herkowitz's malpractice caused the arachnoiditis, plaintiff also pointed to an MRI that was taken on May 30, 2013, which revealed a "cystlike area" that was "concerning for possible arachnoiditis." The orthopedic surgeon who reviewed the MRI stated in a progress note that the "MRI shows mild seroma and arachnoiditis." Plaintiff additionally presented the CT myelogram that was performed on June 3, 2013, which produced the following study result: "There is thought to be developing arachnoiditis."

Defendants' theory at trial, as supported by their expert Dr. Easton, was that the surgical foam was placed outside the dura during the surgery, as was typical, and migrated post-surgery into the dura by negative pressure through a tear in Dr. Herkowitz's suture line, as opposed to its being left inside the dura when the surgical site was closed. Defendants asserted that the evidence established that Dr. Herkowitz, consistent with medical protocol for the procedure, did not place the surgical foam inside of plaintiff's dura. Defendants argued that all of the evidence supported their position and that plaintiff's expert opinion was purely speculative.[4] According to Dr. Easton, more likely than not, plaintiff's arachnoiditis was not caused by the surgical foam. He also opined

---

[2] According to testimony, the dura is a tubular tissue or membrane that extends from the brain to the tailbone through the spinal canal and contains the spinal cord and spinal nerves. The role of the dura is to hold spinal fluid, which provides nourishment to the spinal nerves. Spinal fluid stays inside the dura and flows to and from the brain by means of positive pressure. When the dura is torn, it leaks spinal fluid and can cause significant back and leg pain from increased pressure on the nerves.

[3] Arachnoiditis is an inflammation of the arachnoid, which is a membrane that surrounds and protects the nerves of the spinal cord. Arachnoiditis occurs when the arachnoid becomes inflamed and the nerves begin to stick to one another.

[4] Dr. Blumberg opined that the surgical foam could not have moved or migrated through the area of the sutures and into the dura; he had never heard of such a case.

that plaintiff's subsequent surgeries were not the result of any negligence by Dr. Herkowitz and that dural tears and leaks, along with the arachnoiditis, are known complications of plaintiff's surgery.[5]

After hearing this conflicting expert testimony, the jury reached its verdict. Pursuant to a special verdict form, the jury was first asked whether Dr. Herkowitz was negligent. The jurors answered in the affirmative. The second question posed to the jury was as follows: "Was the plaintiff, Barbara Kindig, injured?" The jury answered, "No." Consequently, as instructed, the jury did not answer any other questions on the jury verdict form, and the trial court entered a judgment of no cause of action. Subsequently, the trial court denied plaintiff's motions for JNOV and/or new trial. Plaintiff appeals by right. The trial court had also denied defendants' motion for directed verdict at the close of plaintiff's proofs at trial. Defendants cross appeal that decision.

## II. PLAINTIFF'S MOTION FOR JNOV OR NEW TRIAL

Plaintiff argues that the trial court erred when it denied her motion for JNOV and abused its discretion when it denied her motion for a new trial because the undisputed evidence established that she suffered injury as a result of Dr. Herkowitz's negligence. We disagree.

We review de novo a trial court's ruling on a motion for JNOV. *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW2d 186 (2003). The evidence and all legitimate inferences are viewed in a light most favorable to the nonmoving party. *Id.* A motion for JNOV should only be granted if the evidence establishes or fails to establish a claim as a matter of law. *Id.* "If reasonable jurors could have honestly reached different conclusions, the jury verdict must stand." *Morinelli v Provident Life & Accident Ins Co*, 242 Mich App 255, 260-261; 617 NW2d 777 (2000).

Under MCR 2.611(A)(1)(e), a trial court may grant a new trial when a jury's verdict was "against the great weight of the evidence or contrary to law." In *Campbell v Sullins*, 257 Mich App 179, 193; 667 NW2d 887 (2003), this Court stated:

> We review the trial court's denial of a motion for a new trial for an abuse of discretion. In deciding whether to grant or deny a motion for a new trial, the trial court's function is to determine whether the overwhelming weight of the evidence favors the losing party. This Court gives substantial deference to a trial court's determination that the verdict is not against the great weight of the evidence. This Court and the trial court should not substitute their judgment for that of the jury unless the record reveals that the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. [Citations omitted.]

---

[5] Dr. Easton posited that repeated dural leaks and tears can happen due to spinal fluid pressure pushing against repaired areas of the dura, which are especially susceptible to tearing. Defendants also suggested that falls and volatile movements made by plaintiff following the initial surgery, which were due to issues unrelated to the surgery, also could have caused the dura to tear.

"The jury's verdict should not be set aside if there is competent evidence to support it." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 498; 668 NW2d 402 (2003). The question of witness credibility is generally left for the finder of fact to assess. *Dawe v Bar-Levav & Assoc, PC (On Remand)*, 289 Mich App 380, 401; 808 NW2d 240 (2010) (citation omitted). Similarly, it is for the jury to decide how much weight should be given to testimony, including expert testimony. *Id*.

"The plaintiff in a medical malpractice action bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Cox v Bd of Hosp Managers for the City of Flint*, 467 Mich 1, 10; 651 NW2d 356 (2002) (quotation marks omitted). Failure to establish any one of these four elements is fatal to a plaintiff's medical malpractice suit. *Id*. As already stated, the jury in this case determined that, although Dr. Herkowitz was negligent during his treatment of plaintiff, plaintiff did not suffer injury.

## A. THE JUNE 4, 2013 SURGERY

Plaintiff first argues that the trial court erred when it denied her motion for JNOV and abused its discretion when it denied her motion for a new trial because there is no dispute that the June 4, 2013 surgery constituted an injury because the surgery was required to remove the surgical foam. We disagree.

The uncontroverted evidence was that plaintiff had to undergo surgery on June 4, 2013 for two distinct reasons. First, Dr. Easton needed to remove the surgical foam from inside plaintiff's dura. According to Dr. Blumberg, when a foreign object is inadvertently left inside of a patient's body during surgery, the item has to be removed at a later time. However, at no point did Dr. Blumberg testify that the sole purpose of the June 4, 2013 surgery was to remove the surgical foam. To the contrary, Dr. Blumberg testified extensively to the jury that the second surgery was necessary to address plaintiff's spinal fluid leak and plaintiff's dural tear. In other words, irrespective of the surgical foam, plaintiff's second surgery was needed and would have occurred on June 4, 2013.

Dr. Easton also made this very point at trial. Dr. Easton testified that, when he reviewed plaintiff's June 2013 CT myelogram, he saw a spinal fluid leak and an unidentifiable "mass effect inside the dura." During surgery, Dr. Easton discovered that the suture line that Dr. Herkowitz had placed in the dura during the initial surgery had torn open and spinal fluid was leaking from the dura as a result. Dr. Easton testified that he extended the incision in order to repair the "dural defect" and to remove the mass that was inside of the dura. When Dr. Easton was questioned about the mass that he removed from plaintiff's dura, he explained that the removal of the mass was only part of the operation:

> *Defense Counsel*: All right. All right. So this, at this point in time during surgery, you did not know exactly what it was and I believe you said you sent it to pathology, correct?
>
> *Dr. Easton*: Well, it didn't matter because I, you know, again, frankly, she was leaking spinal fluid. I got, I got that cleaned up. I got whatever was there gone.

I irrigated it out and then I repaired the dura. So I, I, up until now, none of it had significance other than it was, you know, it was part of the operation that I needed to do. And I wouldn't go in and repair the dura without trying to get a, a shot at whatever that was.

When discussing the June 2013 surgery later in the trial deposition, Dr. Easton indicated that he "was going in to repair the tear" and that his "primary goal was to repair the dura and to get [plaintiff] back on her feet." Thus, the record evidence supported that the June 4, 2013 surgery was necessary to repair the spinal leak. Dr. Easton testified that he did not believe that the presence of the surgical foam inside the dura caused the dura to tear; rather, he believed that the dura tore because of plaintiff's "repeated deep [a]spirations."[6]

Therefore, after reviewing the evidence in a light most favorable to defendants as the nonmoving parties, we conclude that reasonable persons could honestly reach different conclusions about whether the June 4, 2013 surgery was needed to address a complication of an intricate spinal surgery or instead constituted an injury due to Dr. Herkowitz's negligence. Accordingly, the trial court properly denied plaintiff's motion for JNOV. Additionally, the jury's verdict was not against the great weight of the evidence because there was conflicting evidence as to whether the June 4, 2013 surgery was an injury[7] or whether Dr. Herkowitz's negligence caused the need for the surgery. Therefore, it was for the jury to resolve the issue of credibility and to

---

[6] The dissent ignores the factual dispute on this issue at trial. Instead, the dissent uses only plaintiff's expert's testimony to make the following factual findings: (1) "[the foam] very likely was the cause of the dural tearing that needed to be repaired!" and (2) "the overlooked surgical foam . . . most likely did cause the dural tear from stress on the suture and the inflammation ensuing from the presence of a foreign object inside the dura." The dissent does not provide any authority which would allow this Court to resolve this type of factual dispute on appeal. Indeed, the dissent's analysis runs contrary to the standard we must apply when reviewing a trial court's decision on a motion for JNOV, which is to view the evidence and all legitimate inferences in a light most favorable to the nonmoving party. The dissent also disregards that, when reviewing a trial court's decision on a motion for a new trial, a jury's verdict should not be set aside if there is competent evidence to support it.

[7] The dissent correctly points out that plaintiff offered evidence that after the first spinal surgery, plaintiff complained of back pain, and that dural tears were subsequently discovered around plaintiff's spine which required several additional surgeries. The dissent concludes that because Dr. Herkowitz was negligent by leaving the surgical foam behind, these later complications must, as a matter of law, constitute injuries. Indeed, the dissent goes so far as to argue that "the existence of these *injuries* w[ere] never in dispute." (emphasis added). The problem with this argument is that there was testimony presented to the jury that plaintiff's complications could just as easily have occurred after a properly performed procedure where no surgical foam was left behind. The jury apparently accepted defendants' evidence and concluded that plaintiff's complications did not constitute an injury. The jury apparently found that medical complications were wholly unconnected to the malpractice; thus, it did not find an injury occurred.

-5-

allocate weight to each expert witnesses's testimony. See *Dawe (On Remand)*, 289 Mich App at 401.

## B. ARACHNOIDITIS

Next, plaintiff argues that the trial court erred when it denied her motion for JNOV and abused its discretion when it denied her motion for a new trial because there can be no plausible dispute that she developed arachnoiditis as a result of the surgical foam having been left within her dura.

We conclude that there was sufficient and competent evidence to support the jury's verdict that plaintiff did not develop arachnoiditis as a result of the surgical foam. Although a May 30, 2013 MRI indicated concern for possible arachnoiditis and plaintiff's June 3, 2013 CT myelogram cited "developing" arachnoiditis as a possible explanation for a collection of fluid in plaintiff's spinal column, Dr. Easton testified that the CT myelogram could not definitively show that plaintiff was developing arachnoiditis because the scan only showed a dark mass, which was not indicative of anything until properly examined. During the June 4, 2013 surgery, Dr. Easton observed "some clumping of nerves," but did not see "any evidence of arachnoiditis around the" surgical foam. Rather, Dr. Easton testified that "the nerve roots were free" and that "[n]othing was adherent to each other" when he pulled the surgical foam "out." Dr. Easton did not see any evidence of arachnoiditis around the surgical foam. According to Dr. Easton, surgery and dural tears can cause arachnoiditis. Although Dr. Easton did not know for certain whether the presence of surgical foam in a patient's body can cause arachnoiditis, he testified that he did not believe that the surgical foam was the cause of plaintiff's arachnoiditis. Furthermore, plaintiff was not officially diagnosed with arachnoiditis until July 2014, which was over one year after the surgery at issue in this appeal took place. Although Dr. Blumberg testified that he believed that plaintiff's arachnoiditis was caused by the presence of the surgical foam inside of plaintiff's dura, Dr. Blumberg conceded that surgery itself can cause arachnoiditis.

In light of the substantial conflicting testimony as to whether plaintiff's arachnoiditis was an injury caused by the presence of the surgical foam inside plaintiff's dura, the trial court properly denied plaintiff's motion for JNOV. The jury, as factfinder, was free to accept Dr. Easton's opinion or Dr. Blumberg's opinion as to what caused the arachnoiditis. Moreover, the trial court did not abuse its discretion by denying plaintiff's motion for a new trial because the overwhelming weight of the evidence did not favor her.

## C. THE THREE ADDITIONAL SURGERIES

Next, plaintiff argues that the trial court erred when it denied her motion for JNOV and abused its discretion when it denied her motion for a new trial because there is no dispute that her final three surgeries constituted injuries and were necessary to repair dural tears after the surgical foam had been left inside her dura.

We conclude that plaintiff is not entitled to JNOV or a new trial on this ground because the jury was presented with conflicting testimony as to what caused plaintiff's dura to repeatedly tear. In Dr. Blumberg's opinion, the presence of the surgical foam caused the first spinal fluid leak, which required an extended durotomy and increased plaintiff's risk of additional spinal fluid leaks.

Dr. Blumberg testified that the presence of the surgical foam inside plaintiff's dura was more likely than not the reason why plaintiff's dura continued to reopen. However, Dr. Blumberg also acknowledged that the dura can tear for a number of reasons, including the narrowing of a spine or a nick from a sharp instrument. Dr. Easton testified that he did not believe that the three additional surgeries were the result of negligent treatment provided by Dr. Herkowitz. Rather, Dr. Easton testified that plaintiff's dura did not "seal well spontaneously." When asked if this was the result of a medical condition, Dr. Easton testified as follows:

> [E]very time you penetrate the dura, you have to count on it healing. And so, I suppose it could be but sometimes it's just whether it does or doesn't. I mean, some people will form, some people will form a blood clot immediately and it will seat it shut . . . . And in [plaintiff's] case, she obviously was not able to do that or didn't do that for whatever reason because I was—I was not successful in getting it to close after my first try.

Thus, there was ample conflicting evidence that would enable reasonable minds to disagree as to whether plaintiff's three additional surgeries were injuries caused by the presence of the surgical foam. Consequently, the trial court properly denied plaintiff's motion for a JNOV. Additionally, the trial court did not abuse its discretion by denying plaintiff's motion for a new trial because the overwhelming weight of the evidence did not favor her.

## III. DEFENDANTS' MOTION FOR A DIRECTED VERDICT

On cross-appeal, defendants argue that the trial court erred when it denied their motion for a directed verdict because there was no evidence that Dr. Herkowitz breached the standard of care because Dr. Blumberg's testimony was based on pure speculation. We disagree.

This Court reviews de novo a trial court's ruling on a motion for directed verdict. *Nahshal v Fremont Ins Co*, 324 Mich App 696, 718-719; 922 NW2d 662 (2018). A motion for directed verdict challenges the sufficiency of the evidence. *Id*. at 719. A directed verdict "is only appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Id*. If reasonable persons could honestly reach different conclusions regarding whether the nonmoving party established a claim, the motion for directed verdict must be denied, with the case being resolved by the jury. *Id*.

In a medical malpractice action, expert testimony is necessary to establish the standard of care as well as the defendant's alleged breach of that standard of care. *Decker v Rochowiak*, 287 Mich App 666, 685; 791 NW2d 507 (2010). Importantly, defendants are not challenging the *admissibility* of Dr. Blumberg's testimony, so they effectively do not dispute that the jury could consider and assess his testimony, including his opinions. Rather, defendants' claim that Dr. Blumberg's opinion that Dr. Herkowitz placed and left the surgical foam inside of plaintiff's dura was entirely speculative and inconsistent with all of the facts in evidence, which evidence established as a matter of law that Dr. Herkowitz did not put the surgical foam inside of plaintiff's dura and did not sew it into her dura. However, no matter how defendants attempt to frame the issue, the crux of their argument is that Dr. Blumberg's testimony or opinion was not credible and should not have been given any weight. Because credibility determinations are inappropriate for purposes of ruling on a motion for directed verdict, the trial court did not err when it denied

defendants' motion for directed verdict.  See *Williamstown Twp v Hudson*, 311 Mich App 276, 287; 874 NW2d 419 (2015).

Affirmed.

/s/ Thomas C. Cameron
/s/ Stephen L. Borrello