*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF DEBORAH KLAPP, by CAROL
MASSE, Personal Representative,

        Plaintiff-Appellant/Cross-Appellee,

v

MARK ALAN BONO and AUTO PRIDE
COLLISION,

        Defendants,

and

PATSY LOU CHEVROLET, INC.,

        Defendant-Appellee/Cross-Appellant,

and

PATSY LOU BODY SHOP, INC., PATSY LOU
BUICK-GMC, INC., PATSY LOU COLLISION
CENTER, CORUNNA ROAD, LLC, PATSY LOU,
INC., and PATSY LOU WILLIAMSON,

        Defendants-Appellees.

UNPUBLISHED
November 19, 2020

No. 346818
Genesee Circuit Court
LC No. 13-101743-NI

Before: LETICA, P.J., and K. F. KELLY and REDFORD, JJ.

PER CURIAM.

-1-

Plaintiff, as personal representative of the estate of Deborah Klapp ("the decedent"), appeals as of right the trial court's judgment of no cause of action in favor of defendants,[1] including cross-appellant Patsy Lou Chevrolet, Inc. ("PLCI"). We affirm.

## I. BACKGROUND

This wrongful-death case arises out of two related automobile accidents that occurred on Pierson Road in Genesee County on the evening of December 21, 2011. The basic facts are undisputed. The decedent, a motorist, was involved in the first of the two accidents. In the second accident, a vehicle driven by defendant Mark Bono struck decedent as she stood outside of her vehicle. She eventually died from her injuries. Plaintiff's theory of the case was that Bono was driving negligently and in violation of several traffic laws during the second accident and that some or all of the defendants aside from Bono were vicariously liable for his negligence under the owner's liability statute, MCL 257.401, because the vehicle Bono was driving, a Malibu, was a "loaner" vehicle owned by "Patsy Lou Chevrolet" at the time of the accident.

According to Bono, on the date of the accidents, it was a "deeply" overcast, "dreary" day, and when he left work around 5:00 p.m., it "was starting to get dark" and there was "a slight mist on the road."[2] Leaving work in the Malibu, Bono turned onto a five-lane section of Pierson Road, which is "a busy road," consisting of two lanes of travel in each direction with "a turn lane in the middle." Bono was familiar with the area and drove that same route home from work each day. Bono initially drove in the left, eastbound lane. Shortly after he entered the roadway, he heard emergency-vehicle sirens and pulled over into the right lane, stopping while an ambulance, which was headed in the opposite direction on Pierson Road, passed. Immediately in front of Bono, a pickup truck also pulled to the right and stopped for the ambulance.

Deborah Ann Horvath, a woman involved in the first accident, testified that she left work that day around 5:05 p.m., at which time it was "just turning dusk" or "just going to sundown." It had rained earlier that day and "was not raining then," although there "was maybe like a light mist[.]" There was no ice or snow on the ground. Horvath was driving eastbound on Pierson Road, approaching the Dort Federal Credit Union, which is situated along a straight segment of the road at the top of a "moderate" hill. Horvath heard emergency sirens and pulled over to the right in front of the credit union to permit "a police car" to pass in the opposite direction. She stopped at the apex of the hill, "almost in the middle between the exit and the entrance" driveways of the credit union. Horvath's headlights and taillights were on and her brake lights were functioning properly.

Bono testified that after the emergency vehicle went by, traffic resumed and he followed behind the pickup truck, proceeding at the same speed as the traffic around him and maintaining "a reasonable and safe distance" between his vehicle and the pickup truck. It was Bono's habit to

---

[1] Defendant Auto Pride Collision ("Auto Pride") was dismissed from this suit by stipulation of the parties during discovery. Accordingly, any references to "defendants" in this opinion do not include Auto Pride.

[2] Weather reports indicated that sunset on the date in question occurred at 5:02 p.m.

maintain approximately three to five "car lengths" between his vehicle and the one in front of it, depending on the circumstances and speed of travel. He estimated his speed before the second accident at approximately 40 miles per hour. The posted speed limit was 45 miles per hour.

According to Horvath, after the emergency vehicle passed, she was just about to resume driving when the decedent rear-ended her. Horvath put her vehicle in park, exited it, and went to survey the damage, as did the decedent, who had also exited her car. Neither woman attempted to remove her vehicle from the roadway. It was not raining, and, although it was "dusk," it was not "dark." There was "[n]ot much" damage to either vehicle. Horvath, who was standing between the two vehicles, asked the decedent for her insurance information, and as the decedent went back to her vehicle and opened the door to retrieve it, Horvath "saw a car coming." The oncoming "light colored white or silver vehicle" was about 150 yards away, and because it did not appear to be slowing, Horvath anticipated that it would strike the decedent or her vehicle. Horvath did not see a pickup truck.[3] As Horvath fled from between the two parked vehicles and onto the credit union's lawn, she heard a crash and was knocked unconscious. She did not actually see the impact because the decedent's vehicle obscured her vision. Horvath's next memory was of waking on the lawn surrounded by firefighters. She estimated that 25 to 30 seconds elapsed between the first accident and the second one, but she also indicated that it was extremely difficult for her to estimate the timeframe and that she had previously provided differing estimates of up to six minutes. Horvath could not recall whether the decedent had turned on her vehicle's hazard lights following the first accident, but Horvath recalled that she herself had not done so. Horvath indicated that the decedent's headlights had been on after the first accident, but she never saw whether the taillights of the decedent's vehicle were also illuminated.

According to Bono, as he and the white pickup truck approached the site of the first accident, which was "just over" the crest of a "gradual incline" or "hill," "it was dark," "a misty rain" was falling, and the nearest streetlight was out. He "was paying attention" and "wasn't distracted[.]" Suddenly, the pickup truck "quickly moved out into the left lane," swerving around an obstruction in the roadway. "[A]lmost immediately"—Bono could not recall the exact duration—he saw the vehicles from the first accident stopped in the roadway and "did what [he] could to get out of the way," taking "evasive action," but there "just was not enough time to" avoid the ensuing crash. Bono made "a split decision," attempting to swerve and brake, and he believed that he did both, although he was not entirely sure whether he had time to do so before impact. Bono admitted that the Malibu's crash data recorder (CDR) later indicated no braking activity immediately before the second accident and showed that Bono was traveling at 43 miles per hour before the crash. As Bono collided with the decedent's vehicle, he "saw someone's face" for "a brief second," but then his vision was obscured as his airbags deployed. The entire incident "happened very quickly"—so rapidly that it was difficult for Bono to accurately recall the precise timeframe—but he estimated that less than one second transpired between the pickup truck swerving and Bono striking the decedent and her vehicle.

---

[3] On cross-examination, however, Horvath admitted that she had no "independent memory of . . . the particular vehicles that went by" before the second accident.

-3-

Eyewitness, Matthew C. Shanafelt, testified that he was in his automobile and attempting to pull out onto Pierson Road from the driveway of the credit union when an emergency vehicle passed. There was "moderate to heavy" traffic on Pierson Road. "The sun had set," "it was starting to get dark," the area was "not well lit," and it was at that period of dusk "where some people would have their lights on and some people wouldn't." Although Shanafelt was able to see "[c]learly" without the aid of artificial lighting, he indicated it was "hard to say whether [it was] easy to see or not easy to see." All of the traffic on Pierson Road stopped for the ambulance, and, after it was gone, Shanafelt noticed that two of the vehicles—which were parked on the roadway in front of the credit union, making it difficult for Shanafelt to exit onto Pierson Road—remained stationary. He "realized . . . or surmised that they'd been in an accident," though neither vehicle appeared to have suffered any major damage and both appeared to be "drivable." The drivers, two women, exited their vehicles, which remained in the roadway, "within a few seconds" and began to speak with one another and also inspect the damage to their respective vehicles. Shanafelt estimated that after the two women exited their vehicles, "about twenty seconds" passed before the second accident occurred. He did not recall either of the women activating their hazard lights.

Shanafelt, who was on his cell phone when the second accident happened, did not actually witness that accident, although he agreed that he was "in very close proximity" to it. Rather, he heard a crashing noise and turned to see "a woman flying through the air." She landed on the credit union's lawn, and he promptly called 911 to report the accident. First responders arrived on the scene "shortly after."

It was later discovered that, during the collision, Bono struck the decedent and she was dragged and pinned beneath the Malibu. Assistant Fire Chief Elmer Wilson, Jr., happened upon the scene before any other first responders and he discovered the unconscious decedent trapped under the Malibu. According to him, at that time it was neither "raining" nor "misting," the pavement was not wet, and "it was not dark," as there was ample light for him to see clearly.[4] Firefighters extracted the decedent, who had "a weak pulse," and an ambulance transported her to the hospital. The decedent died from her injuries several days later.

According to Bono, after the accident, he observed that although the headlights on the decedent's vehicle were illuminated, the taillights and hazard lights were not. Bono was unable to recall whether either the taillights or the hazard lights had been on before the crash.

Officer David Roy Ramirez, who had received training as an "accident reconstructionist" and regularly performed that duty in his function as a police officer, investigated the accidents on the evening they occurred. When he arrived at the scene, the taillights on the decedent's vehicle were not illuminated, but the rear end of her vehicle had sustained "extensive" damage in the collision. Ordinarily, if the decedent's vehicle's headlights were turned on, the taillights would also automatically turn on. Officer Ramirez later examined the taillight bulbs from the decedent's vehicle. On the driver's side, the "light assembly was smashed," and the taillight bulbs "were too

---

[4] Another responding firefighter also testified that there were "clear, daylight, dry conditions" when he arrived at the scene, with sufficient light to see clearly. On the other hand, a police report concerning the accidents "documented rain as the prevailing weather condition and also indicated that it was dark and unlit" at the scene.

badly damaged" to be operational. On the passenger's side, although one of the bulb's filaments was "stretched," Officer Ramirez initially agreed that that taillight should have been operational unless "the connection from the switch in the battery ha[d] been interrupted[.]" However, on cross-examination, he admitted that, based on the evidence he reviewed, he could only speculate about whether the decedent's taillights had been functioning properly at the time of the second accident. The decedent's hazard lights were not on when Officer Ramirez arrived at the scene, and his investigation revealed no information about whether they had been on before the second accident occurred. Skid marks or "loading marks," which could have been the result of Bono braking, were present at the scene. The nearest streetlight was not functioning and there was insufficient artificial light to properly illuminate the roadway.

As part of his investigation, Officer Ramirez reviewed the Malibu's CDR, which contained data covering the five seconds immediately before the impact of the second accident. The CDR indicated that: (1) the Malibu was traveling at between 43 and 44 miles an hour until at least one second before impact; (2) the engine's revolutions per minute held steady at 1,664 until one second before impact, then dropped to 1,536; and (3) the Malibu's brakes were not applied during the recorded timeframe, nor did its antilock braking system engage. The CDR was incapable of showing any braking that might have occurred in the second immediately preceding impact. An inspection showed that the Malibu's brakes were in "very good" working condition, with "no mechanical defects or malfunctions found to have been a cause factor in this crash."

According to Officer Ramirez, medical testing performed after the accident indicated the presence of no intoxicants in Bono's blood. After surveying the scene of the accident, Officer Ramirez opined that, from a "topographical standpoint," there was nothing that would have obstructed Bono's view of the road as he approached the accident site. In Officer Ramirez's opinion, Bono may have avoided the second accident either by applying his brakes or by swerving around the vehicles in the roadway. Officer Ramirez admitted, however, that based on the damage he surveyed at the scene, it appeared that Bono tried to swerve to the left to avoid the accident. Officer Ramirez further opined that, assuming that Bono's statement about the swerving pickup truck was true, as the officer had interviewed no other witness who saw the pickup truck, it followed that Bono had been following the pickup too closely "at a speed that would not allow him to stop with the assured distance that he had," and Bono's speed represented "a factor" in the ensuing crash. At the speed Bono had been traveling, and providing for reaction time, Officer Ramirez estimated that Bono would have required 189 feet to stop before impacting the decedent's vehicle. The decedent had also violated the "basic speed law" when she rear-ended Horvath during the first accident, and, as the subject accidents occurred after sunset, Officer Ramirez agreed that it would have been "reasonable or prudent" for the decedent and Horvath to have removed their vehicles from the roadway following the first accident, rather than remaining in the roadway while they exchanged insurance information and surveyed the damage. Within one-half mile of the scene, there were numerous driveways or exits that could have been used to exit Pierson Road. Officer Ramirez further agreed that it would have been lawful for the decedent and Horvath to have either moved their vehicles off the roadway or to stand on the nearby lawn while waiting for the police to respond.

Plaintiff also called Thomas George Bereza, a former police officer who now worked as a private investigator and certified accident reconstructionist. Bereza confirmed that local weather reports indicated that there was fog in the area on the evening of the accidents, with visibility of

1¾ miles, and, based on the evidence, he indicated that Bono "never" applied his brakes before the accident. Bereza testified that the decedent's taillights might have been functioning before the second accident and were extinguished when, during the second accident, the impact severed related electrical wiring; however, he admitted that he never personally inspected the decedent's vehicle or its lighting system. Bereza agreed with Officer Ramirez's conclusions that, assuming the truth of Bono's statement about the swerving pickup truck, Bono had been following the pickup too closely given his rate of speed before the accident, that he had been driving at an unsafe speed for the conditions, and that there was nothing at the scene aside from the pickup truck—including the grade of the hill—that would have obstructed Bono's view of the vehicles in the roadway. However, Bereza disagreed with Officer Ramirez that it would have been prudent for the motorists from the first accident to move their vehicles without first exiting them and inspecting the damage to ascertain whether the vehicles remained safe to operate. Bereza agreed that the drivers should have turned on their hazard lights while their vehicles remained on the roadway.

Acting as personal representative of decedent's estate, plaintiff filed a wrongful-death action against defendants in December 2013. In May 2017, following a lengthy discovery period, defendants filed two motions for summary disposition, which the trial court denied.[5]

Thereafter, this case proceeded to a five-day jury trial. After the close of the parties' proofs, plaintiff requested that that the trial court instruct the jury that, if it found that Bono was driving carelessly or recklessly, pursuant to MCL 257.626b, then it could infer negligence on his behalf. The trial court declined to provide this proposed special instruction, reasoning that "reckless driving and careless driving weren't even discussed" at trial.

Without any defense objection, the trial court initially instructed the jury orally concerning M Civ JI 10.08 ("Presumption of Ordinary Care—Death Case"), paraphrasing that instruction:

> Because Deborah Klapp [i.e., the decedent] had died and cannot testify you may infer she exercised ordinary care for her safety and for the safety of others at and before the time of the occurrence. However, you should weigh all of the evidence in determining whether—whether the decedent exercised due care.

Defendant PLCI subsequently objected outside the presence of the jury, arguing that M Civ JI 10.08 should not have been given because "the law is crystal clear in this state that when there is evidence of negligence on the part of the decedent," M Civ JI 10.08 is not appropriate. After consulting the use notes for M Civ JI 10.08 and the cited caselaw, the trial court agreed, over plaintiff's objection, to remove M Civ JI 10.08 from the packet of written jury instructions. The trial court also instructed the jury as follows: "I'm taking out of the packet of instructions one that was improperly given; 10.08. So that will not be given to you, but you will be given a set shortly with the verdict form."

---

[5] We denied defendants' interlocutory applications for leave to appeal. *Estate of Klapp v Bono*, unpublished order of the Court of Appeals, entered January 18, 2018 (Dockets No. 339473 & 339474).

The referenced "verdict form" was a nine-question special-verdict form. The first question asked: "Was Mark Alan Bono negligent?" After deliberating, the jury answered that first question "NO," and, consistent with the verdict form's instructions, the jury did not proceed to answer any of the subsequent questions.

After the trial proceedings concluded, an unusual discovery issue arose, with plaintiff serving subpoenas on the trial court's law clerk, attorney Craig Datz, and attorney Ashley Slaght from PLCI's law firm, Vandeveer Garzia, PC (Vandeveer Garzia). The subpoenas were intended to compel Datz and Slaght to attend depositions, bringing "any and all" relevant correspondence with them. In response, PLCI moved to quash the subpoenas. At oral argument, one of PLCI's trial attorneys, Adam K. Gordon, summarized the situation "as an officer of the court," indicating that "[m]ore than a month" after trial, Vandeveer Garzia, which is "a firm of over 40 lawyers," advertised associate positions. At the time, the trial judge was scheduled to retire shortly. Gordon explained that after observing Datz during the trial in this case, Gordon

> thought that [] Datz, whose time with [the trial court] might be coming to a close at the end of the year, would be a suitable candidate for possible employment. He was interviewed by [Gordon] on one occasion, and then, a separate occasion by shareholders where [Gordon] was not present, or perhaps others. [Gordon] called Mr. Nickola [plaintiff's trial attorney] to let him know that that had occurred, even though [Gordon did] not believe under the Michigan Rules of Court or Michigan Rules of . . . Professional Responsibility, at that point, [he] was even obligated to do so. Mr. Nickola thanked [Gordon]. He appreciated the notification. Said it wasn't a problem,[6] and asked [Gordon] to submit something to him in writing indicating that no offers are ex—or uh—communications regarding potential employment were made during the trial. Of course, [Gordon] happily accommodated that. [Gordon] then received subpoenas for . . . not only the deposition of . . . Ashley Slaght but [also] Mr. Datz.

The parties agreed that, after the attorneys discussed the matter, they teleconferenced with the trial judge, informing her of the situation, and she indicated that Datz would "not have anything further to do with either the parties or this case." Gordon represented to the trial court that "scores" of individuals applied for the advertised positions at Vandeveer Garzia, and he believed that four applicants aside from Datz had also been offered interviews, two of those other applicants had since been hired, and Datz "was simply interviewed" and "was never promised anything."

In support of the motion to quash the disputed subpoenas, Gordon argued that, given that discovery was not open and the jury had already returned its verdict, there was "no procedural vehicle by which" plaintiff's requested depositions could occur. Gordon also argued that Datz's interviews with Vandeveer Garzia strictly complied with all relevant rules of professional conduct and that "the deposition of lawyers in a litigated matter is an extreme remedy that [wa]s certainly not appropriate in this case." Ultimately, the trial court ruled in defendants' favor, quashing the subpoenas under former MCR 2.302(B)(1). The trial judge reasoned that, although she could not

---

[6] Nickola denied that he ever told Gordon that the interviews were "not a problem[.]" Nickola subsequently passed away.

recall the exact date, she remembered that Datz "definitely notified" her of his interviews with Vandeveer Garzia; that during the pertinent postjudgment timeframe, Datz had "done nothing" related to this case other than "maybe" bringing "a file" to the judge; that Datz would have no further involvement with this case whatsoever; that she "firmly believe[d] there was no impropriety"; and that the subpoenas were inappropriate under former MCR 2.302(B)(1) because the postjudgment depositions at issue were not intended to discover information that was relevant to a "claim or defense" in a "pending" action or the "subject matter" of this case, i.e., "an automobile accident."

At the time that the trial court ruled on the motion to quash the subpoenas, plaintiff had a pending motion for a new trial or, alternatively, judgment notwithstanding the verdict (JNOV). Plaintiff argued that the jury's verdict was against the great weight of the evidence. After entertaining oral argument, the trial court denied plaintiff's motion for a new trial, reasoning that, on this record, the court could not disturb the jury's special-verdict finding "that Mr. Bono was not negligent," which seemingly rested on the jury's credibility determinations and the weight that it had assigned to the evidence presented at trial.

These appeals ensued.

## II. DISCUSSION

## A. STANDARDS OF REVIEW

On appeal, the parties raise several claims of error, which are subject to differing standards of review. "[W]e review a trial court's decision whether to grant a new trial for an abuse of discretion," and review any related questions of law de novo. *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001). A trial court abuses its discretion by choosing "an outcome that falls outside the range of reasonable and principled outcomes." *Fette v Peters Constr Co*, 310 Mich App 535, 547; 871 NW2d 877 (2015). "A trial court necessarily abuses its discretion when it makes an error of law." *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016). We will "substantially defer" to the trial court's decision concerning whether a jury's verdict is against the great weight of the evidence, with such deference "rest[ing] in large measure on the trial court's opportunity to hear the witnesses and its consequent position to assess credibility." *Taylor v Mobley*, 279 Mich App 309, 314 n 6; 760 NW2d 234 (2008).

Generally speaking, we review claims of instructional error de novo, with the reviewing court considering the "jury instructions as a whole to determine whether there is error requiring reversal." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). However, with regard to special, or "supplemental," instructions, we review the trial court's decision for an abuse of discretion. *Guerrero v Smith*, 280 Mich App 647, 660; 761 NW2d 723 (2008).

We also "review a trial court's decision to quash a subpoena for an abuse of discretion." *Fette*, 310 Mich App at 547. "A trial court's findings of fact, however, are reviewed for clear error." *Id.* at 547. "A finding is clearly erroneous if, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake was made." *In re AGD*, 327 Mich App 332, 338; 933 NW2d 751 (2019) (quotation marks omitted).

B. GREAT WEIGHT OF THE EVIDENCE

Plaintiff argues that an "in-depth" analysis of the record demonstrates that the jury's verdict was against the great weight of the evidence; therefore, the trial court abused its discretion by denying plaintiff's motion for a new trial. We disagree.

"To establish a prima facie case of negligence, plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages." *Finazzo v Fire Equip Co*, 323 Mich App 620, 635; 918 NW2d 200 (2018). Michigan law has long recognized that those driving on the roadways have many duties, both statutorily imposed and under the common-law standard of due care:

> Many duties are imposed upon the drivers of motor vehicles upon public streets and highways. Some result from express statutory requirements to observe certain speed limits, to stop for certain traffic signals and signs, or, under certain circumstances, to yield the right-of-way, violations of which constitute negligence per se. Other duties are inherent in the exercise of that due care which connotes freedom from negligence as defined by the courts. Among the latter are the duties to maintain a reasonable and proper lookout, to see what is plainly there to be seen and give it due heed, and, before proceeding, from a suitable observation of conditions then and there existing, to form a reasonable belief that it is safe to proceed. [*City of Kalamazoo v Priest*, 331 Mich 43, 47; 49 NW2d 52 (1951) (citation omitted).]

Relatedly, MCL 257.627(1), sometimes referred to as the "basic speed law" or "assured, clear distance ahead" rule, pertinently provides:

> A person operating a vehicle on a highway shall operate that vehicle at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface, and width of the highway and of any other condition then existing. A person shall not operate a vehicle upon a highway at a speed greater than that which will permit a stop within the assured, clear distance ahead.

A driver's duty to maintain a speed that will permit him to stop in the "assured clear distance ahead" applies "with equal force when a driver runs into an object whether it is moving or at rest and whether he is overtaking the object or the object is approaching toward him." *Winslow v Veterans of Foreign Wars Nat'l Home*, 328 Mich 488, 493; 44 NW2d 19 (1950) (quotation marks omitted). Violation of the "assured, clear distance" provision of MCL 257.627(1) creates a presumption of negligence, which a defendant can rebut by showing that the failure to stop was caused by a sudden emergency. *White v Taylor Distrib Co, Inc*, 482 Mich 136, 138 & n 3; 753 NW2d 591 (2008); *Zeni v Anderson*, 397 Mich 117, 134; 243 NW2d 270 (1976).

"The sudden-emergency doctrine is a judicially created principle," the fundamental tenets of which have been long established:

> One who suddenly finds himself in a place of danger, and is required to act without time to consider the best means that may be adopted to avoid the impending danger

-9-

is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence. [*Vsetula v Whitmyer*, 187 Mich App 675, 680-681; 468 NW2d 53 (1991) (quotation marks and citation omitted).]

Because "the doctrine of 'sudden emergency' is nothing but a logical extension of the 'reasonably prudent person' rule," *Baker v Alt*, 374 Mich 492, 496; 132 NW2d 614 (1965), which "applies when a collision is shown to have occurred as the result of a sudden emergency not of the defendants' own making," *White*, 482 Mich at 139-140 (quotation marks omitted), a sudden emergency is not an affirmative defense to a negligence claim, *Szymborski v Slatina*, 386 Mich 339, 341; 192 NW2d 213 (1971). In the context of a car accident, "the test to be applied is what [a] hypothetical, reasonably prudent person would have done under all the circumstances of the accident, whatever they were." *Baker*, 374 Mich at 496. To qualify as a "sudden emergency," "the circumstances attending the accident must present a situation that is 'unusual or unsuspected.' " *Vander Laan v Miedema*, 385 Mich 226, 231-232; 188 NW2d 564 (1971). Circumstances are "unusual" where they vary "from the everyday traffic routine confronting the motorist." *Id.* "Unusual" circumstances are "typically associated with a phenomenon of nature," such as a sudden blizzard. *Id.* Conditions occurring "during daylight hours on a dry, paved highway," are generally not considered "unusual." *Id.* at 232-233.

Conversely, "unsuspected" circumstances include "potential peril[s] within the everyday movement of traffic," such as a disabled vehicle in the roadway that suddenly appears over the crest of a hill. *Id.* at 232. "To come within the narrow confines of the emergency doctrine as 'unsuspected' it is essential that the potential peril had not been in clear view for any significant length of time, and was totally unexpected." *Id.* Generally, "[t]he questions regarding whether defendant experienced a sudden emergency and whether defendant was negligent in driving under the facts presented," are questions of fact properly submitted to a jury. *White*, 482 Mich at 143.

"The grounds for granting a new trial, including a verdict contrary to the great weight of the evidence, are now codified at MCR 2.611(A)(1)," which "provides the only bases upon which a jury verdict may be set aside." *Kelly*, 465 Mich at 38. As we previously observed:

[A] jury's verdict should not be set aside if there is competent evidence to support it. Determining whether a verdict is against the great weight of the evidence requires review of the whole body of proofs. The issue usually involves matters of credibility or circumstantial evidence . . . . [*Dawe v Bar-Levav & Assoc (On Remand)*, 289 Mich App 380, 401; 808 NW2d 240 (2010) (quotation marks, citations, and footnotes omitted).]

"[T]he jury is free to credit or discredit any testimony," and it is the jury's sole prerogative, as trier of fact, to assess the credibility of witnesses and weigh the evidence presented at trial. *Kelly*, 465 Mich at 39-40.

In this case, the jury was presented with conflicting evidence concerning the details of the second accident. In particular, the testimony was conflicting concerning the visibility at the scene, how dark it was, whether the roadway was wet or dry, whether there was any precipitation falling, and whether a pickup truck immediately in front of Bono suddenly swerved just before the second

-10-

accident. There was no evidence clearly demonstrating whether the decedent's taillights were operational before the second accident, and there was evidence tending to *suggest* that neither the decedent nor Horvath turned on their hazard lights following the first accident. It was undisputed that Bono was not driving above the posted speed limit, and, although plaintiff presented the opinion testimony of Bereza and Officer Ramirez who both agreed that if Bono was telling the truth about the pickup truck, he had violated the "basic speed law" by following it too closely given his rate of speed and the conditions, the jury was free to discredit such opinions entirely. See *id*. It was equally free to credit Bono's testimony that, per his habit, he was following at a reasonable distance and safe speed, that he was presented with a sudden and unforeseen emergency after the pickup truck swerved, that he had less than one second to react before impact, and that he took what measures he could to avoid the crash by both swerving and attempting to brake. Indeed, Officer Ramirez admitted that, based on the damage he surveyed, it appeared that Bono tried to swerve left to avoid the accident, and Officer Ramirez also acknowledged that skid marks or "loading marks," which could have been the result of Bono braking, were present at the scene.

In sum, we cannot conclude from this record that the jury's disputed factual finding—that Bono was not negligent—is contrary to the great weight of the evidence. Thus, we also cannot conclude that the trial court abused its discretion when it denied plaintiff's motion for a new trial. If credited as true, Bono's testimony and portions of Officer Ramirez's testimony represented competent evidence supporting the jury's disputed finding. Alternatively, given the lack of definitive evidence about whether the decedent's taillights were operational, the conflicting evidence concerning the lighting and weather conditions, and the testimony suggesting that the decedent's hazard lights may not have been engaged, a rational trier of fact could have reasonably determined that plaintiff failed to carry her burdens of proof and persuasion concerning whether Bono breached his duty of reasonable care. We perceive no basis for displacing the jury's verdict here. Accordingly, we cannot conclude that the trial court abused its discretion by denying plaintiff's motion for a new trial. See *id*.; *Dawe*, 289 Mich App at 401.

## C. JURY INSTRUCTIONS

Plaintiff raises two different claims of instructional error. First, plaintiff argues that the trial court erred when it failed to include a copy of M Civ JI 10.08 in the written instructions that were furnished to the jury for deliberations and instructing the jury to disregard M Civ JI 10.08.[7]

---

[7] M Civ JI 10.08 provides:

> Because [*name of decedent*] has died and cannot testify, you may infer that [he / she] exercised ordinary care for [his / her] safety (and for the safety of others) at and before the time of the occurrence. However, you should weigh all the evidence in determining whether the decedent exercised due care. [Footnote omitted; brackets and emphasis in original.]

-11-

Assuming arguendo that the trial court erred by ruling as it did concerning M Civ JI 10.08,[8] we conclude that error would not warrant reversal here. Under the harmless error rule:

> an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice. [MCR 2.613(A)].

An error warrants reversal under MCR 2.613(A) if it is outcome-determinative, *Ellison v Dep't of State*, 320 Mich App 169, 179; 906 NW2d 221 (2017), or "it significantly interfered with the jury's ability to decide the case intelligently, fairly, and impartially," *Ward v Consol Rail Corp*, 472 Mich 77, 87; 693 NW2d 366 (2005) (quotation marks omitted). Given the jury's specific finding that Bono did not act negligently, the trial court's ruling concerning M Civ JI 10.08—which regards *the decedent's* potential negligence—necessarily could not have been outcome-determinative or have significantly interfered with the jury's ability to decide the case intelligently, fairly, and impartially. Indeed, our Supreme Court reached a similar conclusion in *Johnson v White*, 430 Mich 47, 60-61; 420 NW2d 87 (1988), holding that a trial court's potential error in failing to provide M Civ JI 10.08 was harmless when the jury was properly instructed concerning comparative negligence and returned a special-verdict form specifically finding that the defendants were not negligent. Therefore, we conclude that any error concerning M Civ JI 10.08 was harmless.

Plaintiff's second claim of instructional error involves her proposed special instruction that if the jury found that Bono was violating the "careless driving" statute, MCL 257.626b, at the time of the automobile accident, it "could give rise to an inference or presumption of negligence" on his behalf. Plaintiff argues that the trial court "fundamentally erred" when it refused to provide that special instruction. Although we conclude that the trial court abused its discretion by so ruling, its error was harmless.

> If the applicable model jury instructions

> do not properly cover an area, a trial court is required to give requested supplemental instructions if they properly inform the jury of the applicable law. However, it is error to instruct the jury on a matter not supported by the evidence. The determination whether supplemental instructions are applicable and accurate is within the trial court's discretion. [*Guerrero*, 280 Mich App at 661 (citations omitted).]

---

[8] Recognizing that the trial court's duty to "instruct the jury on the applicable law," MCR 2.512(B)(2), and that "[a] party may assign as error the giving of or the failure to give an instruction only if the party objects on the record before the jury retires to consider the verdict," MCR 2.512(C), we caution PLCI's attorney to be mindful of agreeing that the jury should so be instructed only to later raise an objection after the parties' closing arguments.

The trial court provided the jury with special instructions concerning several applicable statutes and the rebuttable presumption or inference of negligence that could arise from Bono's violation of such statutes. However, the court refused to do so under MCL 257.626b, which pertinently provides: "A person who operates a vehicle upon a highway . . . or other place open to the general public . . . in a careless or negligent manner likely to endanger any person or property, but without wantonness or recklessness, is responsible for a civil infraction." In support, the trial court reasoned that "reckless driving and careless driving weren't even discussed" at trial.

"[E]vidence of violation of a penal statute creates a rebuttable presumption of negligence." *Klanseck v Anderson Sales & Serv, Inc*, 426 Mich 78, 86; 393 NW2d 356 (1986). An instruction concerning such a rebuttable presumption is warranted if: (1) "the statute is intended to protect against the result of the violation"; (2) "the plaintiff is within the class intended to be protected by the statute"; and (3) "the evidence will support a finding that the violation was a proximate contributing cause of the occurrence." *Id*. at 87 (quotation marks omitted).

In this case, Horvath testified that immediately before the second accident, she did not see the pickup truck that Bono described during his testimony. Instead, she described seeing a vehicle matching the description of the Malibu—a "light colored white or silver vehicle," which she described as "a car"—approaching the scene of the initial accident, without seeming to slow, from about 150 yards away. And although Horvath admitted that she did not actually witness the ensuing collision, she testified that, as she fled out from between her vehicle and the decedent's, she heard a crash and was rendered unconscious. If the jury credited Horvath's testimony, it, in concert with the CDR's data, was strong evidence that Bono was driving in a careless or negligent manner by failing to slow when approaching two parked vehicles in the roadway that were in plain sight, mere seconds before the second accident. Also, it seems that MCL 257.626b is intended to protect against the potential result of the specified violation—careless or negligent driving; that the decedent fell within the class of persons the statute is intended to protect—motorists and pedestrians; and that leaving credibility judgments for the trier of fact, a rational view of the evidence at trial would have allowed the jury to find that Bono violated MCL 257.626b, which was a proximate cause of the resulting accident. Therefore, we agree with plaintiff that the trial court should have provided the special instruction to the jury.

However, this error does not warrant reversal. In the context of rebuttable presumptions like the one at issue here, the relevancy of a violation "is usually inherently established when the traffic regulation which was violated concerns the manner in which an automobile was operated." *Klanseck*, 426 Mich at 88 (quotation marks omitted). This was the case here. And, had the jury credited Horvath's testimony as true and discredited Bono's testimony concerning the pickup truck, it would seemingly have failed to return its special-verdict finding that Bono did not act negligently. Given that finding, the trial court's error with regard to the special instruction was harmless; it was neither outcome-determinative nor an error that would have significantly interfered with the jury's ability to decide the case intelligently, fairly, and impartially.

## D. POSTTRIAL SUBPOENAS

Plaintiff contends that the trial court "erred" by quashing the subpoenas that were intended to compel Datz and Slaght to appear for postjudgment depositions. We find no abuse of discretion in the trial court's ruling.

This issue involves the proper construction of the applicable court rules. When construing a court rule, we look to the same principles of interpretation that apply in the context of statutory construction. *Planet Bingo, LLC v VKGS, LLC*, 319 Mich App 308, 324; 900 NW2d 680 (2017). As our Supreme Court explained in *Sun Valley Foods Co v Ward*, 460 Mich 230, 236-237; 596 NW2d 119 (1999):

> The rules of statutory construction are well established. The foremost rule, and our primary task in construing a statute, is to discern and give effect to the intent of the Legislature. This task begins by examining the language of the statute itself. The words of a statute provide the most reliable evidence of its intent[.] If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted. Only where the statutory language is ambiguous may a court properly go beyond the words of the statute to ascertain legislative intent.

> In interpreting the statute at issue, we consider both the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme. As far as possible, effect should be given to every phrase, clause, and word in the statute. [Quotation marks and citations omitted.]

Whenever practicable, the provisions of a statute should be construed as a harmonious whole. *Nowell v Titan Ins Co*, 466 Mich 478, 483; 648 NW2d 157 (2002).

MCR Subchapter 2.300, which generally governs discovery, "authorizes the issuance of a subpoena for the taking of testimony by deposition." *In re Brown*, 229 Mich App 496, 501; 582 NW2d 530 (1998). As relevant here, at the time that the trial court made its disputed ruling, former[9] MCR 2.305 governed the issuance of subpoenas for taking the deposition of nonparties, such as Datz and Slaght. As a form of discovery, however, depositions themselves are governed by MCR 2.302(B)(1), which "sets the bounds of discovery in most civil actions." *Bauroth v Hammoud*, 465 Mich 375, 381; 632 NW2d 496 (2001).

When the trial court ruled on this issue, former MCR 2.302(B)(1) provided, in relevant part, that "[p]arties may obtain discovery regarding any matter, not privileged, which is *relevant to the subject matter* involved in the *pending action*, whether it relates to the *claim or defense* of the party seeking discovery or to the *claim or defense* of another party[.]" (Emphasis added.) This language must not be construed "in a vacuum, heedless of context." See *In re Medina*, 317 Mich App 219, 233; 894 NW2d 653 (2016). Plaintiff attempts to do so, focusing on the phrase "pending

---

[9] MCR 2.305 has since been amended in ways that are immaterial to our analysis in this case.

-14-

action" and contending that because this *case* remained "pending" in the trial court at the time that the disputed depositions were to be conducted—with plaintiff's motion for a new trial or JNOV not yet adjudicated—it follows that those depositions were permissible under former MCR 2.302(B)(1). Plaintiff also argues that because the planned depositions might have uncovered evidence of unethical behavior or ex parte communications concerning this case, the discovery sought was necessarily "relevant to the subject matter" involved in this case.

We disagree. In our estimation, a proper construction of the phrase "pending action" in former MCR 2.302(B)(1) must take into account both the immediately preceding language "*relevant to the subject matter involved in the* pending action" (emphasis added), and the fact that the language immediately thereafter limits the meaning of the phrase "the subject matter in the pending action" to "claim[s]" and "defense[s]."

The meaning of the adjective "pending," as used in this context, is also a relevant consideration. According to *Black's Law Dictionary* (11th ed), the adjective "pending" is relevantly defined, as "[r]emaining undecided" or "awaiting decision," such as "a pending case." Although this case may still have been "pending" in the trial court when the disputed depositions were scheduled to occur, the "action" had already concluded, at least for purposes of former MCR 2.302(B)(1). At that time, plaintiff's claim for wrongful death and defendants' defenses were no longer "pending"; instead, they had been addressed and decided following a jury trial, and the trial court's related judgment had already been entered.

As applied in this case, construing the phrase "pending action" in this way also acts to harmonize former MCR 2.302(B)(1) with the relevant provisions of former MCR 2.301, which provided temporal limitations on the scope of discovery. When the trial court ruled, former MCR 2.301 provided, in pertinent part:

> (A) In circuit . . . court, the time for completion of discovery shall be set by an order entered under MCR 2.401(B)(2)(a).
>
> * * *
>
> (C) After the time for completion of discovery, a deposition of a witness taken solely for the purpose of preservation of testimony may be taken at any time *before commencement of trial* without leave of court. [Emphasis added.]

In our view, the plain meaning expressed by the text of former MCR 2.301 is that, except for depositions taken "before commencement of trial" pursuant to MCR 2.301(C), *all* discovery—including depositions—must occur within the confines of the trial court's scheduling order, absent further order of the court. It is undisputed here that the requested depositions were scheduled to occur long after the scheduled close of discovery and more than a month after the jury returned its verdict. Plaintiff's proposed construction of former MCR 2.302(B)(1), which would permit such depositions to occur, would spawn discord between that rule and former MCR 2.301, which plainly prohibited such untimely depositions.

In sum, we conclude that the trial court's construction and application of the applicable discovery rules was correct. Therefore, we reject plaintiff's claim of error.

-15-

## E. PLCI'S CLAIMS OF ERROR AS CROSS-APPELLANT

As cross-appellant, PLCI asserts two claims of error concerning the trial court's denial of PLCI's motions for summary disposition. However, as we rejected plaintiff's claims of error, any ruling concerning summary-disposition issues can have no practical import, rendering them moot. *Garrett v Washington*, 314 Mich App 436, 449; 886 NW2d 762 (2016) ("A matter is moot if this Court's ruling cannot for any reason have a practical legal effect on the existing controversy.") (quotation marks omitted). Hence, we decline to address PLCI's claims of error as cross-appellant.

Affirmed.

/s/ Anica Letica
/s/ Kirsten Frank Kelly
/s/ James Robert Redford